ISHEE, J.,
 

 for the Court.
 

 ¶ 1. Tony Ames was convicted in the Lowndes County Circuit Court of Count I, armed robbery, and Count II, aggravated assault. The circuit court sentenced him to sixteen years on Count I and ten years on Count II, with said sentences to run concurrently. Aggrieved by his convictions, Ames appeals. Ames asserts the following alleged points of error:
 

 I. The circuit court erred by denying a directed verdict on the armed robbery charge, and neither of his convictions was supported by the weight of the evidence.
 

 II. He was entitled to a lesser-included offense instruction on simple assault.
 

 III. The circuit court improperly limited his cross-examination of Officer James Faris.
 

 IV. The circuit court improperly limited his theory of defense evidence.
 

 V. He was prejudiced by being seen by the venire in jail clothes.
 

 VI. The State was allowed to improperly attempt to impeach a defense witness with prior testimony.
 

 Finding no reversible error, we affirm Ames’s convictions and sentences.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On January 10, 2006, Preston Hal-bert suffered injuries at the hands of Ames and Ames’s cousin, Donnell Briggs, in Lowndes County, Mississippi. Halbert went to the emergency room the next day where he underwent surgery to repair a broken nose and a broken cheekbone. Initially, Halbert filed a misdemeanor simple assault complaint in justice court. The justice court judge sent Halbert to the
 
 *133
 
 sheriffs department, where Halbert recounted to Officer John Faris what had happened. On April 2, 2006, Ames was indicted by a Lowndes County grand jury for armed robbery and aggravated assault. A trial was held in the Lowndes County Circuit Court from August 27-29, 2007.
 

 ¶ 3. Halbert testified that on the night he was attacked, he was walking down to the store to buy his sister some cigarettes. On the way, he ran into Carol Malone, and she accompanied him on his walk. It was raining, so when Malone noticed Ames and Briggs in a car, she walked across the street and asked them for a ride to the store. Ames and Briggs agreed to give Halbert and Malone a ride.
 

 ¶ 4. In the car, Ames asked Halbert, “Don’t you owe my homey some money?” Halbert said he had his sister’s twenty dollars, but he denied owing Briggs any money. Ames then told Halbert to give his “homey” some money, or he would knock out his teeth.
 

 ¶ 5. When they arrived at the store, Briggs stopped the car on the street near the store, and Halbert noticed him reaching under the front seat of the car. Seeing this, Malone told Halbert that he had better get out of the car and run. As Halbert tried to get out of the car, Ames swung at him with a pair of brass knuckles. Hal-bert got out of the car and tried to run, but Briggs was already outside. Halbert said he tried to run to the store to call the police, but he was struck in the face. Ames and Briggs then threw Halbert on the ground and beat him. During the beating, Halbert lost consciousness, and he later awoke to Malone shaking him outside the store. He said he still had his sister’s twenty dollars, but the money had been in his watch pocket, where it would have been difficult to find. Halbert said that his wallet was missing, but he thought that he lost it while running from Ames and Briggs.
 

 ¶ 6. Malone corroborated Halbert’s account of what happened in the car. She also said she saw Ames and Briggs with shiny sharp objects, which they used to beat and poke Halbert. She thought one of the objects was a pair of brass knuckles. According to Malone, Ames and Briggs also kicked Halbert after he fell to the ground.
 

 ¶ 7. Nell Shaw, a nurse practitioner with Baptist Memorial Hospital, examined Hal-bert when he was brought into the hospital following the incident. She noted the following injuries: the left side of his face and his nose were swollen and bruised; he had pain in his ribs; and there were abrasions on his hands. She found no fractures to his hands or ribs. X-rays revealed fractures in his nose and in the bones on the left side of his face near his eye. She agreed that Halbert’s injuries were serious bodily injuries that were caused by means likely to produce death or serious bodily injury. She found that they were consistent with the effects of a beating with a blunt object.
 

 ¶ 8. Officer Faris was an investigator with the Lowndes County Sheriffs Department. He became involved in the case two weeks after the incident following Hal-bert’s appearance in justice court. Officer Faris took a statement from Halbert, and he interviewed Malone, Briggs, and Ames. He was not able to recover any weapons. He said he did not try to get a search warrant because it had been two weeks since the incident, and he did not think he had probable cause. In his statement to Officer Faris, Halbert did not report that anything had been taken from him. However, Officer Faris was aware that Hal-bert’s wallet was missing.
 

 ¶ 9. Briggs, who was Ames’s cousin, testified on Ames’s behalf. He denied that
 
 *134
 
 anything happened the way that Halbert or Malone described. Instead, he claimed that Halbert was the one who attacked Briggs.
 

 ¶ 10. Briggs testified that he and Ames gave Halbert and Malone a ride to the store. Briggs had drunk a few beers, so when they arrived, Briggs got out and went around the corner of the store to use the bathroom — apparently in the alley or street. When he came back from around the corner, he said that Halbert was coming at Ames with a knife. At that point Ames slipped, and Briggs approached the two men. Briggs said that Halbert then tried to attack him with the knife. Briggs responded by hitting him, and he kept hitting him. He said that Ames got up and may have hit Halbert a few times too. As Halbert was backing up, he tripped over some bricks and fell.
 

 ¶ 11. According to Briggs, he and Ames tried to get the knife away from Halbert, but he would not give it up even after he had fallen to the ground. Eventually, however, he agreed to give the knife to Malone. Briggs and Ames then got in the car and left. Briggs denied that either he or Ames possessed any weapons that night. He said that they were only defending themselves, and he thought that Halbert was going to seriously injure Ames.
 

 ¶ 12. On cross-examination, the prosecution impeached Briggs with his prior statements that were inconsistent with his trial testimony. Briggs testified he had drunk two beers that night, but he previously stated that he had drunk three or four beers. Based on his testimony, there was also a question as to whether the car that they had driven to the store was stopped when Malone approached or if Malone had flagged them down as they were driving. Briggs previously told Officer Faris that he had heard Ames and Halbert arguing, but at trial, he denied making such a statement. His testimony was also inconsistent as to what he actually saw of the fight. One time, he said Ames was already on the ground, while he testified at trial that he had seen Ames slip while backing up. Whether Briggs saw Halbert actually swing a knife at Ames was also unclear. Furthermore, despite Halbert’s injuries, Briggs told the prosecutor that he saw Halbert immediately get up, walk off with Malone, and get in a truck. Briggs said that Ames had suffered a cut to his right hand as a result of the fight, and he said that Ames was the only one who was bleeding following the fight.
 

 ¶ 13. Ames’s child’s mother — Jamonica Rogers — testified on his behalf and confirmed that Ames came to her house that night with a badly cut hand. Rogers said that Ames was bleeding all over the floor, and she even slipped in the blood. However, Ames did not go to the hospital for his injury.
 

 ¶ 14. Ames offered his version of the events that night, which basically corroborated Briggs’s testimony. He admitted that he hit Halbert, but it was “out of frustration and anger,” and it was only after Halbert began trying to attack Briggs. Ames said that he was initially charged with simple assault, but then it was changed to aggravated assault and armed robbery. He initially wavered, but he confirmed his previous statement to Officer Faris that Halbert attacked him with a sword or a very large knife. However, he said that he allegedly suffered an injury to his finger from the sword that almost went to the bone and left meat hanging off his finger. Nevertheless, he did not go to the doctor. In his statement to Officer Faris, he made no mention of being cut by Halbert. Besides the cut, Ames also admitted that he never men
 
 *135
 
 tioned to Officer Faris a number of other facts to which he testified at trial. These included the fact that he grabbed the sword and would not let go and that Briggs repeatedly hit Halbert.
 

 ¶ 15. The jury returned a verdict of guilty on both counts, and the circuit court sentenced Ames to sixteen years on the conviction of armed robbery and ten years on the conviction of aggravated assault, with said sentences to run concurrently.
 

 DISCUSSION
 

 I. Whether it was error to deny Ames’s motion for a directed verdict on the armed robbery charge, and whether Ames’s convictions were supported by the weight of the evidence.
 

 ¶ 16. Ames first argues that the State did not present any evidence that anything of value was taken from Halbert; therefore, it did not make a sufficient case for armed robbery. Additionally, Ames argues that his convictions of armed robbery and aggravated assault were against the overwhelming weight of the evidence.
 

 ¶ 17. The State counters by pointing out that Halbert testified that Ames and Briggs initially threatened him in order to get money from him. Also, on appeal, the State argues that Ames took Halbert’s wallet. However, we see no merit to this because while Halbert’s wallet was missing, the only testimony regarding the missing wallet was that Halbert thought he had lost it while running from Ames and Briggs. They did not get the twenty dollars that was in Halbert’s watch pocket, but the State argues that their attempt was sufficient to constitute robbery. To support its position, the State cites Mississippi Code Annotated section 97-3-79 (Rev.2006), which states that:
 

 Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery....
 

 A. Sufficiency of the Evidence
 

 ¶ 18. Our review of a motion for a directed verdict tests the legal sufficiency of the evidence.
 
 Bush v. State,
 
 895 So.2d 836, 843(¶16) (Miss.2005) (citing
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968)). The appellate court must ask whether the evidence shows “beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.”
 
 Id.
 
 (quoting
 
 Carr,
 
 208 So.2d at 889). Taking the evidence in the light most favorable to the prosecution, the question is whether a rational trier of fact could have found all the essential elements beyond a reasonable doubt.
 
 Id.
 
 (citing
 
 Jackson v. Virginia,
 
 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
 

 ¶ 19. Ames does not argue that the State failed to present sufficient evidence regarding the remaining elements of armed robbery, nor do we find that the evidence regarding the other elements to be insufficient. The State offered sufficient evidence that Ames committed violence to Halbert’s person — the attack— and that Ames put Halbert in fear by exhibiting a deadly weapon — the brass knuckles. Therefore, our review is limited to considering whether there was sufficient evidence that Ames attempted to take any personal property from Halbert during the course of the attack.
 

 
 *136
 
 ¶ 20. This Court has recognized that section 97-3-79 criminalizes the attempt to take a victim’s personal property the same as actually taking the victim’s property.
 
 Putnam v. State,
 
 877 So.2d 468, 471(¶ 10) (Miss.Ct.App.2003). In
 
 Putnam,
 
 this Court found that an indictment charging that the defendant did “feloniously attempt to take and carry away” the personal property of the victim properly charged the defendant with robbery.
 
 Id.
 
 at (¶¶ 9-10). This Court found no error with the indictment in
 
 Putnam
 
 despite the fact that the defendant did not actually take or carry away the victim’s personal property, and the indictment did not charge such.
 
 Id.
 
 at (If 6).
 

 ¶ 21. In the present case, corroborated testimony indicated that the incident began as a demand by Ames and Briggs for Halbert to give them some money. The testimony also indicated that when Halbert refused to hand over any money, Ames and Briggs threatened Halbert, attacked him with weapons, and left his unconscious body on the street. Taking the evidence in a light most favorable to the prosecution, we find that there was sufficient evidence from which the jury could find the necessary elements of robbery. We find no error with the circuit court’s denial of Ames’s motion for a directed verdict.
 

 B. Weight of the Evidence
 

 ¶ 22. In reviewing a motion for a new trial, the question is whether the jury verdict was against the overwhelming weight of the evidence.
 
 Bush,
 
 895 So.2d at 844(¶ 18) (citing
 
 Herring v. State,
 
 691 So.2d 948, 957 (Miss.1997)). We must weigh the evidence in the light most favorable to the verdict, and only when a verdict is so contrary to the overwhelming weight of the evidence that it creates an unconscionable injustice will we reverse.
 
 Id.
 
 The motion “is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.”
 
 Id.
 
 (quoting
 
 Amiker v. Drugs for Less, Inc.,
 
 796 So.2d 942, 947(¶ 18) (Miss.2000)).
 

 ¶ 23. “[T]he credibility of witnesses is not for the reviewing court.”
 
 Webster v. State,
 
 817 So.2d 515, 519(¶ 16) (Miss.2002) (quoting
 
 Gathright v. State,
 
 380 So.2d 1276, 1278 (Miss.1980)). It is up to the jury to decide what parts of the witnesses’ testimonies to accept or reject as credible.
 
 Id.
 

 ¶ 24. In the present case, the jury heard two versions of the events that took place on the night of January 10, 2006. It was the jury’s determination that Hal-bert’s testimony, corroborated by Malone, was more credible than the theory of self-defense offered by Briggs and Ames. We see no problem with this, especially in light of the inconsistencies in Briggs’s and Ames’s testimonies that the prosecution brought to light.
 

 ¶ 25. From the evidence that has been discussed, we do not find that the verdict was contrary to the overwhelming weight of the evidence. Halbert and Malone testified that Ames: (1) demanded money from Halbert, (2) threatened Halbert if he did not give him some money, (3) ruthlessly beat Halbert with a pair of brass knuckles until Halbert lost consciousness, and (4) left Halbert’s unconscious body on the side of the street. We find no error with the denial of Ames’s motion for a new trial regarding either of his convictions. This issue is without merit.
 

 II. Whether it was error to deny Ames’s requested lesser-included offense jury instruction on simple assault.
 

 
 *137
 
 ¶ 26. Next, Ames takes issue with the circuit court’s refusal to grant a lesser-included offense instruction informing the jury that it could find Ames guilty of simple assault instead of aggravated assault. Ames points out that there was testimony that he did not have a weapon and that he suffered defensive wounds fending off Hal-bert’s attacks.
 

 ¶ 27. A defendant is entitled to offer a jury instruction that presents his theory of the case; however, a court may refuse a jury instruction that is not supported by the evidence in the case.
 
 White v. State,
 
 842 So.2d 565, 575(¶ 30) (Miss.2003) (citing
 
 Smith v. State,
 
 802 So.2d 82, 88(¶ 20) (Miss.2001)). “[A] lesser-included offense instruction is authorized if a rational or reasonable jury could find the defendant not guilty of the principal offense in the indictment, but guilty of the lesser-included offense.”
 
 Id.
 
 (citing
 
 Pleasant v. State,
 
 701 So.2d 799, 804(¶ 19) (Miss.1997)).
 

 ¶ 28.' Ames was convicted of aggravated assault, which is proscribed by Mississippi Code Annotated section 97-3-7(2) (Supp.2008):
 

 A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm....
 

 Mississippi Code Annotated section 97-3-7(1) (Supp.2008) provides for simple assault:
 

 A person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (b) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm....
 

 ¶ 29. In the present case, the circuit court found that the evidence was undisputed that Halbert suffered serious bodily injury; therefore, a simple assault instruction was unnecessary. The circuit court stated the following in refusing to grant Ames’s requested simple assault instruction:
 

 But the injury, the undisputed testimony at this point in time is that the injury was serious bodily injury.
 

 Now, whether it occurred through self-defense or through an aggravated assault, it was serious bodily injury.
 

 This instruction will be refused, because it seems to this Court that either the defendants — or either — the defendant’s [sic] either guilty of aggravated assault or he is not guilty, because of self-defense.
 

 That seems to be the — and that’s what the testimony was, that it was — that he was intentionally struck.
 

 ¶ 30. The testimony from Shaw regarding Halbert’s injuries was that his face was swollen and bruised; his ribs were sore; and there were abrasions on his hand; and it was difficult for him to move his thumb. As a result of the beating, Halbert suffered a broken nose and broken bones in his face near his eye, and his injuries required surgery to repair. Shaw agreed that Halbert’s injuries were brought about in a means likely to produce death or serious bodily injury and were serious bodily injuries.
 

 ¶ 31. In this case, the issue of whether there was sufficient evidence to give a simple assault instruction hinges on whether there was any evidence from which a jury could find that Halbert’s injuries were
 
 *138
 
 anything less than serious bodily injuries. From the evidence presented, we do not find that there was sufficient evidence to grant a simple assault instruction. Shaw’s uncontested testimony was that Halbert’s injuries were serious. The injuries previously described unquestionably support this finding.
 
 See Brown v. State,
 
 934 So.2d 1039, 1043 (¶¶ 11-12) (Miss.Ct.App.2006) (severity of a broken jaw and the necessary treatment did not allow for a simple assault instruction). Had Ames presented testimony or any evidence that Halbert’s injuries were not serious, then a simple assault instruction may have been warranted.
 
 See Odom v. State,
 
 767 So.2d 242, 246(¶ 13) (Miss.Ct.App.2000) (proper to give a simple assault instruction when the defendant presented a witness who testified that the victim’s injuries were not serious). However, Ames presented no such evidence, and the circuit court noted such in deciding not to give a simple assault instruction.
 

 ¶ 32. With Ames having failed to present any evidence that Halbert’s injuries were not serious, we find no error with the circuit court’s determination that the severity of Halbert’s injuries would not have supported a conviction of simple assault. Accordingly, we find that this issue is without merit.
 

 III. Whether the circuit court improperly limited cross-examination of Officer Faris.
 

 ¶ 33. Next, Ames takes issue with the circuit court’s limitation of his cross-examination of Officer Faris. Ames argues that the circuit court improperly denied him the ability to cross-examine Officer Faris about the fact that he did not find any weapons at the scene and that he did not obtain a search warrant to look for any weapons.
 

 ¶ 34. The scope of cross-examination is broad; however, the circuit court has the inherent power to limit it to relevant matters.
 
 Foley v. State,
 
 914 So.2d 677, 691(¶ 30) (Miss.2005) (quoting
 
 Heflin v. State,
 
 643 So.2d 512, 518 (Miss.1994) (overruled on other grounds)).
 

 ¶ 35. In the present case, the circuit court sustained objections to cross-examination when the questions called for hearsay answers. For example, the judge explained to Ames’s attorney that she needed to lay a proper foundation if she wanted to cross-examine Officer Faris about what he found out “according to his investigation” when his sources were hearsay.
 

 ¶ 36. However, Ames’s attorney was permitted to cross-examine Officer Faris about any statements made by Halbert. Also, contrary to Ames’s argument, Officer Faris testified that he did not recover any weapons from the scene of the crime. On cross-examination, he also admitted that he did not try to get a search warrant because it had been two weeks since the attack. Having been so long since the crime, he did not think that there was probable cause to obtain a warrant. Additionally, the cross-examination of Officer Faris brought out the fact that the deputies who initially responded to the scene did not recommend to their reporting officer that felony charges should be filed. Instead, they instructed Halbert to go to justice court to file charges. He also admitted that the case was not referred to his office for further investigation until two weeks after the attack. Further supporting Ames’s contention that no robbery occurred was the fact that Officer Faris had no knowledge of anything having been taken from Halbert.
 

 ¶ 37. Based on the forgoing, we find that Ames’s attorney properly cross-examined Officer Faris. Ames’s defense theory was brought out in Officer Faris’s testimo
 
 *139
 
 ny when he said: (1) no weapons were found; (2) he did not attempt to get a search warrant; (3) the attack was initially considered a misdemeanor incident by the responding deputies; and (4) he did not know that anything was taken from Hal-bert. The circuit court sustained objections to the hearsay testimony, but it was proper for the court to block the introduction of such testimony. M.R.E. 802. We find no error with the circuit court’s rulings concerning Ames’s attorney’s cross-examination of Officer Faris. This issue is without merit.
 

 IV. Whether the circuit court improperly limited Ames’s theory of defense.
 

 ¶ 38. Ames argues that the circuit court improperly limited his testimony concerning what happened in the justice court proceeding. Ames claims that the testimony was offered to impeach Halbert and that Ames’s defense was prejudiced when the circuit court limited the testimony.
 

 ¶ 39. Ames cites
 
 Nalls v. State,
 
 651 So.2d 1074, 1076 (Miss.1995), to support his argument that he should have been allowed to testify about hearsay statements from Briggs’s trial. In
 
 Nalls,
 
 the supreme court recognized the broad discretion afforded to defense counsel on cross-examination.
 
 Id.
 
 The supreme court found that “[w]hen a hearsay statement has been admitted into evidence, the credibility of the hearsay declarant may be attacked to the extent that is allowable had the hearsay declarant actually testified at trial.”
 
 Id.
 
 Ultimately, the error in
 
 Nalls
 
 was harmless.
 
 Id.
 

 ¶ 40. The State first claims that this issue is waived for failure to object at trial. The State also counters that, in limiting Ames’s testimony, the circuit court properly sustained objections to hearsay evidence. According to the State, the objections were made when Ames attempted to testify about what Constable Sonny Sanders told Ames on the phone and about what the justice court judge allegedly said to Ames. The circuit court sustained the hearsay objections, but it allowed Ames to testify as to what happened or what he did as a result of the justice court hearing.
 

 ¶ 41. After reviewing the record, we agree that Ames was not prevented from presenting any theory of his defense when he was not allowed to testify as to what the constable or the justice court judge told him. The circuit court allowed Ames to testify regarding what happened in justice court as long as he avoided hearsay statements. We further find
 
 Nalls
 
 distinguishable because Ames was not attempting to impeach the credibility of a hearsay declarant. Instead, he was the one trying to offer the hearsay testimony. Once again, under Rule 802, hearsay is generally not admissible at trial, and the circuit court properly excluded it. We find no error in the circuit court’s ruling; therefore, this issue is without merit.
 

 V. Whether being seen by the venire in jail attire prejudiced Ames.
 

 ¶ 42. Ames admits that his next point of error likely does not warrant reversal on its own, but he encourages this Court to consider it in light of his other alleged errors. Ames argues that he was prejudiced because the jury was allowed to see him in his prison attire. He was not shackled or handcuffed, but he was wearing jail clothes during voir dire.
 

 ¶ 43. The State points out that Ames was to blame for his appearance before the venire in prison attire because he had made inadequate arrangements for his mother to bring civilian clothes for him to wear. At the time for the trial to begin, the circuit court was told that Ames’s mother would arrive with the clothes in
 
 *140
 
 approximately twenty minutes, so the court delayed the trial twenty minutes to find him some clothes or to await the arrival of his mother. Upon learning that no civilian clothes were forthcoming, the circuit court proceeded with voir dire with Ames still wearing his prison garb. The circuit court stated that it would let him change into civilian clothes when his mother arrived.
 

 ¶ 44. On the record, the circuit court stated that:
 

 Mr. Ames has been set for trial for three months. He is in jail attire. He has indicated that he told his mother all last week to bring him clothes. She has not done so.
 

 This Court has no clothing for him to wear up here, other than the clothing that the sheriffs department has given him.
 

 I’ve made — I even recessed the jury for another 15 to 20 minutes to give his mother time to be here, and she has apparently not shown up.
 

 If she does show up and has some regular clothing for him, then I will allow him to change at a break, but until she does, I cannot continue this case any further.
 

 He has indicated, “he” being Mr. Ames, has indicated to the Court that she knew several times last week that she was supposed to bring clothing. Okay.
 

 It was not until after the following events occurred that the circuit court proceeded with voir dire: (1) Ames’s mother failed to arrive before the start of trial or in the extended time that she was allowed; (2) the bailiff checked the public defender’s office for clothes; and (3) Ames’s attorney checked to see if there were extra clothes at the jail.
 

 ¶ 45. The State argues that Ames waived this issue because he did not make an objection at trial. As the State points out, there was no objection at trial to Ames’s proceeding to trial in his prison attire. It was the circuit judge and not Ames’s attorney who questioned whether Ames would be going to trial in prison garb. Accordingly, this issue was not raised for the circuit court to rule on and is, therefore, waived on appeal. As such, the issue is proeedurally barred from our review.
 
 Howell v. State,
 
 800 So.2d 556, 560(¶ 15) (Miss.Ct.App.2001) (citing
 
 Crenshaw v. State,
 
 520 So.2d 131, 134 (Miss.1988)).
 

 ¶ 46. Alternatively, this issue is without merit. Ames cites a number of cases in which it was found to be improper to try a defendant who was in shackles, but he does not cite any cases relating to prison clothing. On the other hand, the State cites
 
 Jackson v. State,
 
 860 So.2d 653, 668(¶ 49) (Miss.2003), in which the supreme court found that the fact that the jury saw the defendant in prison attire did not warrant reversal. The supreme court noted that “prejudicial attire is ‘distinctive, identifiable attire,’ that may affect a juror’s judgment.”
 
 Id.
 
 (quoting
 
 Estelle v. Williams,
 
 425 U.S. 501, 504-05, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). In
 
 Jackson,
 
 the supreme court found that the defendant was not prejudiced, partly because his prison clothing consisted of ordinary navy pants and a blue shirt.
 
 Id.
 
 Furthermore, the trial court did not deny Jackson the opportunity to change clothes; the court explained that no other clothing was available.
 
 Id.
 

 ¶ 47. The record in this case reflects that Ames was wearing a plain white shirt and regular shoes, but it does not reflect the type of pants worn by Ames. From this, we And nothing to indicate that Ames was dressed in any clothing that would
 
 *141
 
 prejudice his defense. The record contains no mention of the point in the proceeding, if any, when Ames received his civilian clothing from his mother. Nevertheless, the circuit court allowed Ames sufficient opportunity to obtain civilian clothes and even attempted to locate clothes for Ames to wear at trial. Ames made plans for his mother to bring him clothes. We cannot fault the circuit court for her tardiness in arriving with those clothes prior to trial.
 

 ¶ 48. Ultimately, this issue is procedurally barred because Ames did not object at trial. Furthermore, there is no evidence that Ames was prejudiced by his appearance before the venire in prison attire. We do not find that this issue requires reversal of his convictions.
 

 VI. Whether the State was allowed to improperly impeach Briggs with prior testimony.
 

 ¶ 49. Lastly, Ames takes issue with the State’s introduction of portions of the transcript from Briggs’s trial, which the State offered to impeach Briggs. Ames argues that there was no contradiction between Briggs’s testimony at his trial and his testimony at Ames’s trial; therefore, the introduction of the transcript was improper impeachment.
 

 ¶ 50. However, as the State points out, Ames made no objection alleging that the impeachment of Briggs was improper. Ames did object that Briggs had already answered a question or two and that the prior testimony should not be read into the record, but there was no objection to the State’s impeachment of Briggs with his prior testimony. As the State further points out, “an objection on one or more specific grounds constitutes a waiver of all other grounds.”
 
 Burns v. State,
 
 729 So.2d 203, 219(¶ 67) (Miss.1998) (quoting
 
 Conner v. State,
 
 632 So.2d 1239, 1255 (Miss.1993) (overruled on other grounds)). Accordingly, this issue was waived at trial, and it is procedurally barred from our review.
 

 ¶ 51. Furthermore, this issue is also without merit. This Court has stated the following regarding the admission of prior inconsistent testimony:
 

 Before a party may impeach a witness under Rule 613(b) there must be an actual contradiction in fact between the testimony and the prior statement. It is generally held that a prior statement is inconsistent if under any rational theory its introduction might lead to a conclusion different from the witness’s testimony.
 

 Everett v. State,
 
 835 So.2d 118, 122(¶ 11) (Miss.Ct.App.2003) (citing
 
 Ratcliff v. State,
 
 752 So.2d 435, 439 (¶¶ 17-18) (Miss.Ct.App.1999)).
 

 ¶ 52. After reviewing Briggs’s testimony, we find no error with the circuit court permitting the impeachment of Briggs. We agree with the circuit court that Briggs made a number of denials and was evasive in his responses to the prosecutor. There were slight inconsistencies in Briggs’s recollection of the number of beers he had drunk on the night of the attack. He also wavered when testifying as to whether he saw Halbert slip or whether Halbert was already on the ground when Briggs came back from around the corner of the building. Therefore, we find that there was a “rational theory” under which his prior testimony could lead to a different conclusion from his testimony during Ames’s trial. This issue is without merit.
 

 ¶ 53. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY OF CONVICTION OF COUNT I, ARMED ROBBERY, AND SENTENCE OF SIXTEEN YEARS, AND COUNT II, AGGRAVATED ASSAULT, AND SENTENCE OF TEN
 
 *142
 
 YEARS, WITH THE SENTENCES TO RUN CONCURRENTLY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LOWNDES COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.