ISHEE, J.,
for the Court:
¶ 1. After repeatedly beating his live-in girlfriend, Sheena Dison, Terry Truelove was found guilty of two counts of domestic violence-aggravated assault. Truelove was sentenced to twenty years in the custody of the Mississippi Department of Corrections (MDOC), for each count, with fifteen years of the sentence in Count II to run concurrently with the sentence in Count I, and five years of the sentence in Count II to run consecutively to the sentence in Count I, for a total of twenty-five years to serve, all as a habitual offender, without eligibility for probation or parole. Aggrieved, Truelove appeals his conviction, claiming that the evidence was insufficient to prove that he caused serious bodily injury, which was a necessary element of domestic violence-aggravated assault. Therefore, he asserts the circuit court erred by denying his motion for a directed verdict. Finding no error, we affirm the circuit court’s judgment.
FACTS AND PROCEDURAL HISTORY
¶ 2. Truelove and Dison began dating in June 2009, and they moved in together in Steens, Mississippi, shortly thereafter. On August 17, 2009, Truelove struck Dison in the face and head and punched her in the *364 nose, stomach, side, and face. He also threatened to kill her with a knife. After the beating, Truelove forced Dison to lie down with him in the bed and threatened to kill her if she left. However, Dison escaped the home by climbing through a bedroom window after Truelove went to sleep. She suffered a broken nose and concussion, and she had numerous bruises and scratches all over her body.
¶ 3. However, Dison and Truelove soon reconciled and moved back in together. A few weeks later on September 7, 2009, they had another altercation, wherein Truelove punched Dison in the head and all over her body with his fists, grabbed her by her hair, cut her with a small metal object, and strangled her. Dison eventually escaped and was rescued by an off-duty police officer. From this altercation, Di-son suffered a broken rib, a loose tooth, and bruises and cuts all over her body.
¶ 4. The original indictment from a Lowndes County grand jury on October 20, 2009, charged Truelove with two counts of domestic violence-aggravated assault and one count of kidnapping. For the first charge of domestic violence-aggravated assault, the indictment stated that Truelove did “unlawfully, feloniouslyt,] purposely, and knowingly, cause serious bodily injury to Sheena Dison, a person with whom he had a current dating relationship, by punching ... Dison in the face and head, [and] breaking her nose.... ” The second charge of domestic violence-aggravated assault stated that Truelove did “unlawfully, feloniouslyt,] purposely, and knowingly, cause serious bodily injury to Sheena Di-son, a person with whom he had a current dating relationship, by striking ... Dison about her body, [and] fracturing one of her ribs....”
¶ 5. On May 20, 2010, the State moved to amend the indictment to include habitual-offender language pursuant to Mississippi Code Annotated section 99-19-81 (Rev. 2007). Truelove had previously been convicted in Arizona for attempted aggravated assault and sentenced in 2004 to serve ten years in prison, but he received a suspended sentence and was placed on probation. However, the probation was revoked on June 9, 2006, and Truelove served two and a half years in the Arizona Department of Corrections. Truelove also had been convicted of grand theft of lost property in California and sentenced in 1994 to serve a term of one year and four months in the custody of the California Department of Corrections and Rehabilitation (CDCR). He also had a conviction in California in 1994 of unlawful driving or taking of a vehicle, for which he was sentenced to serve one year and four months in the custody of the CDCR, and another conviction in California in 1989 for selling marijuana or hashish, for which he served two years in the custody of the CDCR.
¶ 6. At trial, Dison testified that on August 17, 2009, she awoke early that morning, got out of bed, went into the living room to turn the television off, but while doing so, she heard a noise outside. She went out the back door to investigate, but did not see anything. After returning to the house, she discovered that Truelove was not in bed, so she began looking for him. She went back outside and encountered Truelove, who told her: “Now you’re going to have to kill me.” Truelove then ran up to Dison, grabbed her hair, pulled her down, and began punching her.
¶ 7. Truelove eventually stopped hitting her and went inside. Dison got up and went back in the house to retrieve her belongings so she could leave. However, Truelove told her she could not leave, grabbed her by her hair again, and resumed beating her. The fight made its way into the bedroom, and Truelove punched Dison in the nose so hard that her *365 nose began to bleed profusely, splattering large clots of blood on the carpet and bedding. Truelove then told Dison to clean up the mess she had made. When she went into the bathroom to clean up, Truelove went into the kitchen and came out with a knife. At this point, his son, Terry, who had been staying at the house, ran out of his room and grabbed the knife from Truelove’s hand.
¶ 8. Truelove then went back into the bedroom and ordered Dison to “lay down.” She tried to get up once, but Truelove told her he would kill her if she left. Dison waited until Truelove fell asleep and escaped through a bedroom window. Dison ran until she came to a country store, where she saw a man who looked familiar. He drove Dison to her grandmother’s house. Dison went to the Winfield emergency room, where she was treated by Dr. Michael Baker. At the hospital, Dison was diagnosed with a fractured nose and a concussion.
¶ 9. A few days later, Truelove and Di-son reconciled and they began living together again. Truelove promised Dison that he would cut down on his drinking and apologized to her. However, on September 7, 2009, another altercation took place. Dison came home from work that evening, and some of Truelove’s friends were at the house. Dison came home from work and was in the kitchen when Truelove came in to talk to her. She noticed that his eyes were larger than normal and that he had a “wild look.” She accused Truelove of smoking crack cocaine, and he slapped her on the top of her head and pushed her. Dison then turned around and sprayed Truelove with pepper spray a co-worker had given her.
¶ 10. She ran out of the house to tell the people sitting outside that Truelove had just hit her. One of the men, Truelove’s uncle, simply got up and left the residence. The other men did nothing to help her. When she went back inside the house to get her purse and leave, she saw Truelove exiting the bathroom, where he had been trying to wash off the pepper spray. Truelove immediately ran over to Dison and began pulling her by the hair and hitting her again.
¶ 11. Truelove dragged Dison to the bedroom, threw her on the bed, got on top of her, and began choking her. She testified that she thought at this point that she was going to die because she could not breathe or call for help. She noticed the pepper spray lying on the bed, so she grabbed it and gave Truelove a full dose of the spray in his face. Truelove jumped off Dison and scrambled to the door to attempt to prevent her from leaving. Dison then bit Truelove’s hand, pushed him out of the way, and ran out of the house to the front yard.
¶ 12. Dison’s purse was still in the living room, so she asked Truelove’s son, Terry, who was outside, to go back in to get it. As Terry was retrieving the purse, Dison was in the front yard, using the water hose to attempt to wash off some of the pepper spray that had accidentally been sprayed on her. Truelove ran back outside, pushed Dison down, kicked her, and dragged her by her hair back into the house. Terry tried to pull Truelove off of Dison, while Truelove kicked Dison in the head, and hit her with a small metal object across her back, neck, and one of her ears. Dison begged Truelove to release her, and he said he would allow her to leave only after she cleaned up the mess of blood and pepper spray on the floor.
¶ 13. Dison pretended to clean up the floor, but when Truelove went into another room, she ran to the bedroom, found her tennis shoes, and put them on. She grabbed her purse, bolted out the front door, and ran down the road. A truck *366 with a man and his wife inside saw Dison running and stopped to give her a ride. The man, Lamar Peacock, was an off-duty officer with the Columbus Police Department. He testified that he almost ran over Dison as she was running, bloodied and wet, down the road. When their truck pulled over to help her, Dison told the Peacocks that her boyfriend had just beaten her. They urged her to report the incident to the police.
¶ 14. The couple took Dison back to her place of employment and helped her call the police and an ambulance. Dison stated that she did not want to go to the hospital, because all she wanted to do was “just lay down and go to sleep.” She testified that an emergency medical technician (EMT) told her that she probably had a concussion after he saw blood running out of her ears and her eyes “rolling off from the light” when he shone a flashlight into her eyes. She also stated that she felt a horrible pain in her lungs when she tried to breathe and had bruising around her ribs. After the EMT cleaned her up, the police took photographs of her injuries. The next day, after a recommendation from a police detective handling the case, Dison sought medical treatment at the Millport Family Practice Clinic. She waited to see the doctor, but the doctor was unable to see her that day. She did not make a follow-up appointment, nor did she seek further medical care.
¶ 15. Deputy Todd Mistrot, with the Lowndes County Sheriffs Department, testified he responded to the 911 call on September 7, 2009. He saw the bruises, blood, and red marks on Dison’s body. Deputy Mistrot went with other officers to Truelove’s house to investigate. When they arrived at the house, one of the officers saw, through the bedroom window, a man changing bloody sheets. Truelove answered the door to the house, and Deputy Mistrot arrested him. Deputy Mistrot took the sheets and pillows from the bed to preserve them as evidence, and he took multiple photographs of the crime scene. Blood was on the walls, window casing, door frame, carpet, and sheets in the bedroom. Deputy Mistrot stated that the “sheets and the pillows were pretty well soaked with blood.” He also stated that he saw a trail of blood in the hallway leading to the bedroom. Dr. Baker, Dison’s treating physician after the first beating, also testified. He stated that a CT scan showed that Dison had a fractured nose. She also had numerous bruises on her body and a concussion.
¶ 16. On the witness stand, Truelove gave a different account of both events. He claimed that he broke Dison’s nose by accident in early August 2009, not on August 17, 2009, when he threw back his elbow to get away from his dog that had jumped on the couch. Truelove claimed that they were sitting on the couch playing fetch with his dog, a pit bull. The dog jumped up on Truelove and scared him, and as he jerked his elbow back, he accidentally hit Dison in the face, who was sitting next to him.
¶ 17. Truelove also claimed that Dison sought medical attention after the incident for the sole purpose of securing drugs because she was an addict. Dison had been smoking methamphetamine with her friends earlier that night. Truelove went to sleep, but he woke up in the middle of the night to find Dison “tweaking” from the effects of the drug. She ran out the back door of the house, but came back in and accused Truelove of being in the bathroom with another woman. Truelove said they had words, but they went back to bed. When he woke up the next morning, Dison had stolen the money in Truelove’s wallet, along with some of his prescription medications, and she had left the house. *367 A few days after she left, Dison spoke to Truelove on the phone. During the conversation, he apologized and asked her to come back home.
¶ 18. On the night of September 7, 2009, Truelove testified that Dison came home from work and accused him of being high on drugs because his eyes were bulging. Truelove stated that his eyes regularly bulged because he had hyperthyroidism. He stated that Dison sprayed him with pepper spray, and he went into the bathroom to wash it off. As he was washing himself in the bathtub, Dison came in and tried to spray him again. He finally got out of the tub and protected himself by restraining Dison with a shower curtain. He told Dison to clean up the mess and open the windows to get the smell out. While he went to the bedroom to change clothes, Dison was in the front yard, talking to Terry and smoking cigarettes. Di-son soon came back into the house and resumed her attack with the pepper spray. He went back to the bathroom to wash off, and Dison grabbed her shoes and purse and ran out of the house.
¶ 19. The prosecution introduced into evidence pictures of the house, with blood splattered on the walls, door frames, bed linens, and floors. While responding to questions about the photographs showing the condition of the home’s interior after the altercation, Truelove claimed that the blood on the sheets was from Dison’s menstruation. He also stated that the pepper spray was a dark orange color, similar to the color of blood, and that the photographs depicted pepper spray on the sheets, door frame, and walls, and not blood. Truelove further admitted to hitting Dison in September 2009, but he insisted he did not punch her with his fists, choke her, or drag her through the house by her hair. He also admitted he had hit Dison on other occasions.
¶20. The prosecution also introduced into evidence photographs of Dison’s injuries from the September 2009 beating. Truelove claimed that because Dison was Caucasian, she bruised easily. The photographs showed Dison with a busted lip, black eye, red marks around her throat and neck, fingernail marks around her neck and shoulders, bruising on her legs and torso, and dried blood around one of her ears. When asked about Dison’s black eye, Truelove stated that it was make-up, and not the result of an injury. He also claimed that the picture of blood coming out of Dison’s ear was due to a tumor she had behind her ear, not due to any injuries he might have inflicted. He further opined that the scratches and bruises shown on the photographs were due to Dison being restrained by the shower curtain when he was trying to subdue her from spraying him with pepper spray.
¶ 21. After the State concluded its casein-chief, Truelove moved for a directed verdict, which the circuit court denied. After all of the evidence had been presented for both sides, the jury delivered a guilty verdict on the two counts of domestic violence-aggravated assault, but it acquitted Truelove on the charge of kidnapping.
DISCUSSION
¶ 22. Truelove argues that the circuit court erred by denying his motion for a directed verdict, because the State failed to prove that he had inflicted serious bodily injury upon Dison. He claims that a broken nose, concussion, and broken rib are not serious, life-threatening injuries, and the State did not submit proper medical proof to support a finding that Dison suffered from a broken rib.
¶ 23. Our standard of review of a denial of a motion for a directed verdict is *368 clear. If upon our review, the evidence shows “beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed,” then we will not hesitate to affirm a trial court’s denial of a motion for a directed verdict. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). The question is not whether this Court finds that the evidence established Truelove’s guilt beyond a reasonable doubt, but whether “after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (citation omitted).
¶ 24. Considering the evidence in the light most favorable to the State, we find that there was sufficient evidence to convict Truelove. Domestic violence-aggravated assault is covered by two applicable subsections under Mississippi Code Annotated section 97-3-7 (Supp.2011). Section 97-3-7(2) provides:
A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]
In addition, section 97-3-7(4) states:
A person is guilty of aggravated domestic violence who commits aggravated assault as described in subsection (2) of this section against, or who strangles, or attempts to strangle ... a person who has a current or former dating relationship with the defendant.... For the purposes of this section, “strangle” means to restrict the flow of oxygen or blood by intentionally applying pressure on the neck or throat of another person by any means.
Serious bodily injury is that “which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.” Buffington v. State, 824 So.2d 576, 580 (¶ 15) (Miss.2002). While Truelove maintains that a broken nose and concussion are not serious injuries, case law and common sense do not support his argument.
¶ 25. First, a broken nose has been found to constitute a serious bodily injury. Ames v. State, 17 So.3d 130, 137 (¶¶ 30-31) (Miss.2009). Dr. Baker testified that Di-son suffered a broken nose from the first altercation, and Officer Peacock stated that when he picked up Dison after the second altercation, her nose was still crooked. Proof of the broken nose alone was enough to support a claim of serious bodily injury. However, Dr. Baker also characterized her “mild” concussion as being a “closed-head trauma.” Common sense necessitates a finding that a “closed-head” trauma is a serious bodily injury. Therefore, we find Truelove’s issue regarding the first count of domestic violence-aggravated assault is without merit.
¶ 26. Truelove further asserts that the State failed to provide medical proof that Dison suffered a broken rib from the second altercation. Dison testified that Truelove beat and kicked her in the ribs. After the beating, she could barely breathe, and when she tried to take a breath, her lungs felt like they could not hold any more air. Photographic evidence shows bruising around Dison’s ribs. Officer Peacock testified that when he found Dison, she told him that she was having trouble breathing and that her sides were hurting. In addition, Deputy Mistrot testified that when he *369 saw Dison that night, she had both old and new bruises around her rib cage. Dison informed Deputy Mistrot that Truelove had beaten and kicked her in the ribs, and she was having trouble breathing. The EMT also noted, upon his examination of Dison, that the area around her rib cage was very tender.
¶ 27. After reviewing the entire record, we find that the testimony regarding Di-son’s assertions that Truelove beat and kicked her in the ribs, her experience of severe pain and difficulty breathing after the beating, and the photographic evidence showing bruising and redness around her ribs support a finding that Truelove was guilty of domestic violence-aggravated assault for the September 2009 beating. Thus, this issue is also without merit.
¶ 28. THE JUDGMENT OF THE LOWNDES COUNTY CIRCUIT COURT OF CONVICTION OF COUNTS I AND II, DOMESTIC VIOLENCE-AGGRAVATED ASSAULT, AND SENTENCE AS A HABITUAL OFFENDER OF TWENTY YEARS FOR EACH COUNT, WITH FIFTEEN YEARS OF EACH COUNT TO RUN CONCURRENTLY AND FIVE YEARS OF THE SENTENCE FOR COUNT II TO RUN CONSECUTIVELY TO THE SENTENCE FOR COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LOWNDES COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR.