# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00260-COA

**JEREMY SHANE FOGLEMAN A/K/A JEREMY FOGLEMAN A/K/A JEREMY S. FOGLEMAN**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

DATE OF JUDGMENT: 02/17/2020
TRIAL JUDGE: HON. LAWRENCE PAUL BOURGEOIS JR.
COURT FROM WHICH APPEALED: HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY: JOEL SMITH
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 01/12/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. On July 8, 2015, Edward Frederickson was mortally injured when an orange Camaro, being pursued by the Gulfport police, ran a red light and broad-sided Frederickson's vehicle. Frederickson's vehicle was pushed into another vehicle being driven by Cassandra Walker, who was also injured as a result. Jeremy Fogleman was charged with two counts of failing to stop for a law enforcement officer (one for causing Frederickson's death and one for causing Walker's injuries) and one count of possession of methamphetamine that was found in the Camaro. A Harrison County Circuit Court jury found Fogleman guilty of all charges,

and the circuit court sentenced him to forty years of incarceration for Frederickson's death; ten years of incarceration for Walker's injuries, set to run consecutively; and three years of incarceration for the drug charge to run concurrently—all in the custody of the Mississippi Department of Corrections. Fogleman appeals, claiming, among other things, that he was not the driver of the Camaro; he also challenges the sufficiency of the evidence, the lawfulness of the seizure of the drugs, and the adequacy of the jury instructions. Finding no error, we affirm Fogleman's convictions and sentences.

**Facts**

¶2. On February 17, 2016, a Harrison County grand jury indicted Fogleman on four counts: failing to stop for a law enforcement officer and causing the death of Frederickson in violation of Mississippi Code Annotated section 97-9-72(4) (Rev. 2014); failing to stop for a law enforcement officer and causing injury to Walker in violation of subsection 3 of the same statute; possession of methamphetamine, a Schedule II controlled substance, in violation of Mississippi Code Annotated section 41-29-139(c)(1) (Supp. 2014); and perjury for falsely testifying at a preliminary hearing that he was not the driver of the vehicle that collided with and killed Frederickson and injured Walker.[1] Early in the proceedings of the case, the circuit court judge granted Fogleman's request to represent himself; however, Fogleman also had appointed counsel who assisted throughout the pre-trial hearings and the trial. The trial on the first three counts began on February 4, 2020, during which the

---

[1] The district attorney did not pursue the perjury charge.

following facts were presented.[2]

¶3.    At approximately 12:30 a.m. on July 8, 2016, Gulfport Police Officer Nicholas Kehoe saw the driver of an orange Camaro rev the engine and spin the wheels while leaving a stop sign.[3] Kehoe, referring to this as a "burnout," thought this was careless driving and decided to follow and stop the vehicle.[4] Kehoe initiated his dash cam, which recorded the events that followed. It took Kehoe a few seconds to catch up to the Camaro because it was speeding. At the next stoplight at the intersection of Pass Road and 28th Avenue, Kehoe pulled up behind the Camaro and saw that it did not have a license plate displayed. The speeding and failure to display a license plate confirmed Kehoe's decision to make the traffic stop, and as the Camaro turned the corner onto Pass Road, Kehoe activated his blue lights and siren. Instead of stopping, the Camaro sped off, reaching speeds in excess of 100 miles per hour on streets with 35-mile-per-hour speed limits.

_____

[2] Between 2016 and 2020 there was extensive pre-trial activity, including several petitions with the Mississippi Supreme Court that Fogleman filed pro se. These included an approximately 609 page, including attachments, "Petition for Writ of Mandamus," filed on October 30, 2018. In it Fogleman meticulously covered the details of his case, and accused law enforcement of tampering with evidence. He claimed they deliberately kept him from viewing the scene and all the evidence; he also alleged constitutional violations. He supplemented this with a 335-page supplement on November 7, 2018. On March 18, 2019, Fogleman filed a 354-page "Petition for Interlocutory Appeal" with attachments. The supreme court denied both his motion for interlocutory appeal and petition for writ of mandamus on June 19, 2019. Fogleman filed motions to reconsider which the supreme court denied on September 19, 2019. Thereafter Fogleman filed another 207-page (including attachments) "Petition for Writ of Mandamus" on June 24, 2019. On August 7, 2019, Fogleman filed another 76-page "Petition for Writ of Mandamus," which the supreme court also denied.

[3] Kehoe said it "produced a cloud of smoke and a loud screeching noise."

[4] But Kehoe did not activate his lights or sirens at this point.

3

¶4.    As the Camaro, followed by Kehoe's patrol car, reached the intersection of 8th Avenue and Pass Road, Kehoe said he turned off his lights and sirens for safety reasons, thinking that this may cause the Camaro to slow down. The Camaro did not stop at the red light but proceeded through the intersection, hitting Frederickson's Chevy Malibu on the driver's side and pushing it into the rear of Cassandra Walker's Nissan Murano, which had just made a left turn from Pass Road. All of this was captured on Kehoe's dash cam.

¶5.    The driver and passenger in the Camaro, which had deployed its airbags, exited their vehicle. The dash cam clearly showed the Camaro door being opened and the driver, allegedly Fogleman, getting out. Officer Kehoe ordered him to show his hands, which the driver did by turning and placing them on the roof of the car. Kehoe ordered the driver to the ground. He complied, but it was obvious his leg was weak because he stumbled to the ground and rolled over on his stomach. The passenger cannot be seen in the dash-cam footage, except for fleeting moments, but according to Sandridge, the alleged passenger, he too complied and went to the ground. The dash cam continued to show how the driver then rolled over, and lay behind a sign until emergency personnel arrived and placed him on a stretcher to take him to the hospital. A photo of Fogleman on the stretcher was entered into evidence. Sandridge was not injured and remained at the scene.

¶6.    Officer Kehoe checked on Frederickson, who had been thrown to the passenger side of his vehicle and was unresponsive. Kehoe also checked on Walker, who initially said she was not in need of medical assistance. Nonetheless, she, Frederickson, and Fogleman were all transported to Gulfport Memorial Hospital.

4

¶7.    At the hospital, Fogleman was diagnosed with alcohol intoxication, a closed-head injury, contusion, drug abuse, and a scalp laceration. Although he was released to the police that night, Fogleman was called back to the hospital after x-rays revealed that he had a fractured tibia. Walker suffered aggravation of a prior back injury and bruising to her left side and ankle.[5] But Frederickson did not fare well. He suffered multiple injuries, including but not limited to multiple head injuries, causing bleeding on his brain, a neck fracture, broken ribs, a punctured lung, pelvic injuries, and injuries to his internal organs. He was ultimately airlifted to Mobile where his course of treatment was unsuccessful, and he died on July 15, 2015.

¶8.    Fogleman claimed that not he, but Sandridge, was driving the Camaro at the time of the collision. Fogleman testified that he had arranged to sell the Camaro to Sandridge and had picked Sandridge up that night to complete the sale. Fogleman said he had met Sandridge through a "customer of his,"[6] who introduced the two over the phone a couple of weeks before the accident. Sandridge told Fogleman that he was interested in buying a "muscle" car and Fogleman took Sandridge's number.

¶9.    Fogleman previously had discussions with Bayside Motors about buying the Camaro, but they could not come to an agreement. Several days later, while on his way to look at another car to potentially sell to Sandridge, Fogleman went by Bayside again and saw that

---

[5] Walker testified that she continued to have ankle and knee swelling as a result of the collision through the time of the trial.

[6] Fogleman said he buys and sells automobiles and parts. He claims to be a master engine and transmission builder and a master automotive, marine, and motorcycle technician with a particular interest in high performance, luxury, and sports cars.

the Camaro was still there. Bayside was about to send it to auction, and Fogleman got a good deal on it. Fogleman said he called Sandridge, and Sandridge agreed to buy it from him.

¶10.   So Fogleman said he purchased the car from Bayside on July 7, 2016, and went to meet Sandridge at an address that Sandridge had given him. Fogleman found him in an apartment with several other people who were obviously taking drugs. Fogleman showed Sandridge the car. Sandridge asked to test-drive the car, but Fogleman refused, fearing that Sandridge might damage the clutch or just take off with the car. Sandridge agreed to buy it but said he would not have the money until later. So Fogleman went to Taco Bell and bought food for himself, Sandridge, and the others in the apartment.

¶11.   After they had eaten, Fogleman said he proceeded to take Sandridge to another address to get the purchase money. On the way, Fogleman said they stopped to check out a red Mustang that Fogleman was interested in buying. Fogleman said they bought some gas at the Shell station nearby. The receipt from that purchase is time and date stamped "July 7, 2015, 11:47:55." Fogleman then drove to Angel's Auto Sales, where he checked out the truck he was interested in. They left Angel's and Sandridge gave Fogleman directions to a house that Fogleman believed was Sandridge's parents' house. Sandridge went in and came back with an envelope containing $20,000. Fogleman and Sandridge had agreed that Sandridge would pay the remaining $8,000 balance in two weeks. Fogleman put the money in Taco Bell bag and put it in the side pocket of the driver's seat.

¶12.   According to Fogleman, the two shook hands on the deal and switched places in the Camaro north of Interstate 10. Fogleman asked Sandridge to drop him off at a hospital in

6

Biloxi, so Sandridge started driving down Highway 49. Fogleman said that they ended up on Pass Road. Sandridge pulled over and started "fumbling with something around by his waist," which made Fogleman nervous. Fogleman said Sandridge revved the engine, popped the clutch, and spun out. Fogleman testified that apparently Officer Kehoe had seen this. Fogleman told Sandridge that the police were behind them, and Sandridge got nervous. They stopped at a light, and then Sandridge sped off, "running the car full out." After they pulled away from the police car, Fogleman said Sandridge pulled a gun from his waist. Fogleman said he told Sandridge to stop as they neared the 8th Avenue intersection. Fogleman saw a car coming through the intersection but he did not know who had the green light. Fogleman said it seemed like Sandridge was trying to stop and swerved to the left, but Sandridge still hit the car.

¶13. Fogleman said he hit his head on the windshield, and his leg hit the dashboard, breaking his tibia. According to Fogleman, Sandridge got out of the driver's side with the gun he had and walked over to a field. Meanwhile, Fogleman said he got out from the passenger side and hobbled over to the Malibu, but he could not see anyone inside. He hobbled back to the Camaro and leaned into the driver's side, trying to locate his money, but he did not see it. Fogleman speculated that as he leaned in, blood from the cut on his head may have gotten onto the deployed driver's side airbag. At that point, Officer Kehoe drove up, and Fogleman stood next to the Camaro with his hands up. Fogleman claimed that the dash cam video had been altered and did not accurately reflect what happened that night, but he presented no proof to support this. He also claimed that the Camaro's brakes were not

7

repaired correctly and that he did not get back his personal property and money that were in the Camaro that night.[7]

¶14.    Sandridge testified to a completely different story. He said he was walking alongside the road on the way to a friend's house when Fogleman pulled over and offered him a ride. Sandridge accepted even though he did not know Fogleman. After picking up Sandridge, Fogleman stopped at a gas station, and Sandridge recalled their stopping at a lot to look at a red mustang. Sandridge said he complimented Fogleman on the Camaro and asked if Fogleman knew how to drive a car like that. Fogleman said he did and started to show Sandridge "what the car had." By this Sandridge meant Fogleman was driving fast and "drifting" from side to side. But at a stoplight, the car stalled, and when Fogleman got it in gear, the tires spun as they took off. Sandridge saw the police blue lights come on, and he told Fogleman who, instead of stopping, sped ahead. Sandridge asked Fogleman what was his problem but received no response. Sandridge prepared for the worst by putting on his seatbelt and cracking a window in case of a wreck. As they neared the intersection of Pass Road and 8th Avenue, Fogleman changed lanes from the right to the left. The light changed from yellow to red, but Fogleman kept driving through. Fogleman ran into the side of Frederickson's Malibu that was crossing in front of them. The Camaro's airbags deployed, and then Sandridge got out. Officer Kehoe, who was almost immediately on site, told him and Fogleman to get on the ground, and Sandridge complied. Thereafter, while

_____

[7] Outside the presence of the jury, Fogleman insinuated to the court that the money may have been taken by one of the investigating officers, Kelley Clark, who he claimed was a meth user and was under investigation by federal law enforcement for manufacturing evidence. He had no proof to support these allegations.

8

Frederickson, Walker and Fogleman were taken to the hospital, Sandridge, who was unhurt, stayed at the scene and was questioned. As mentioned earlier, it is impossible to see the passenger in the dash-cam video, but Sandridge's voice is heard giving his name and social security number to the officers.

¶15. Since the cars could not be driven from the scene, according to Gulfport Police Department protocol, law enforcement officers searched them before they were towed. No money or valuables were found in the Camaro, but Officer Nicholas Guilliot did find a substance that appeared to be methamphetamine in a clear plastic baggie in the Camaro's center console. Subsequent testing by forensic scientist Velveda Harried with the Mississippi Forensics Laboratory confirmed that the baggie contained 1.94 grams of methamphetamine.

¶16. An accident reconstructionist, Joshua Bromen, visited the scene and later collected the crash data reports (a.k.a. "black boxes") from the vehicles.[8] He determined that two and a half seconds prior to impact, Fogleman was driving 100 miles per hour, and at a half of a second prior to impact, he was still traveling at 65 miles per hour. The posted speed limit was 35 miles per hour. He also pointed out that the reduction in speed prior to impact showed that the brakes were working.

¶17. State Medical Examiner Staci Turner, who performed the post-mortem examination on Frederickson's body, testified that he died from the blunt force injuries he suffered from the accident. Although during Fogleman's cross-examination Dr. Turner agreed that Frederickson had developed sepsis, metabolic acidosis, and respiratory distress during what

---

[8] The black boxes and the data contained in them were obtained by Detective Clark and Officer Kevin Kinney pursuant to a search warrant.

9

could be termed was a "complicated medical course," Dr. Turner opined that the "main findings were that Frederickson suffered "blunt force injuries—many, many blunt force injuries. Basically from the top of his head all the way down throughout his whole body" because of the wreck he was in. The complications came from being hospitalized, and he was hospitalized because of the accident.

¶18. Law enforcement also found blood on the driver's door, the driver's seat, the center console, and the passenger airbag. Pursuant to court-issued warrants, police collected samples from these areas and obtained, through a blood warrant, a buccal (mouth) DNA swab from Fogleman. George Schiro, the director of the Scales Biological Laboratory, testified that all samples matched Fogleman's DNA.[9] Schiro also testified that he was not given a DNA sample from Sandridge, but he said it did not matter because Fogleman's DNA was such an accurate match.

¶19. In addition to the documented DNA proof, Officers Kehoe and Shaun Sebring who were present at the scene of the accident, both identified Fogleman as the individual in the dash-cam footage who exited the driver's side, rolled away from the Camaro, and was treated by the EMTs and taken to the hospital. In other words, they identified Fogleman as the driver.

¶20. Detective Kelley Clark, who at the time of trial was a detective sergeant in the Professional Standards Bureau with the Gulfport Police Department, also testified. At the

---

[9] Schiro testified that the DNA on the driver's side airbag matched Fogleman's with such accuracy that "the expected frequency or how likely it would be that we find this in the general population is less than one in 999 trillion."

10

time of the accident, she was a detective in the department's criminal investigation unit. She arrived on the scene that night after EMT personnel had taken Fogleman, Frederickson and Walker at the hospital. But Sandridge was still there and she interviewed him and noted that he was not bleeding. She reviewed the dash cam video and testified that the driver exiting the Camaro had the same color shirt as that which was retrieved from Fogleman, which was entered into evidence. She also explained how the dash cam video is saved in the computer and that it cannot be altered. She further testified about her investigation thereafter, including contacting the accident reconstructionist. Through her, the State also entered into evidence a "Gulfport Municipal Court Judgment of Plea," indicating that Fogleman appeared in a city court on July 10, 2015, and entered a plea of guilty to operating the Camaro without insurance on July 8, 2015. She also testified to the retrieval of the black-box data and a video she made of footage from a nearby business's security camera that showed the Camaro speeding through the intersection and colliding with Frederickson's car. Through her, the State also presented Fogleman's prior criminal history, which included two prior convictions for felony fleeing and eluding.[10]

¶21. During Fogleman's questioning of Detective Sergeant Clark, who he contended had been under federal investigation for manufacturing evidence, the court reminded Fogleman that it had ruled on that issue and not to bring it up. Defying the court's ruling, Fogleman asked the witness about it nonetheless. The court held Fogleman in contempt and warned him that any further disruptive conduct would result in Fogleman's loss of his right to self-

---

[10] Fogleman had been convicted of these charges in Okaloosa County, Florida, in February 2015, and in Biloxi, Mississippi, in August 2016.

representation.

¶22.    Just prior to presenting his defense, the circuit court heard argument on the relevancy of the many subpoenas that Fogleman had issued.  Some were quashed but some were not.  Thereafter, the court asked Fogleman if he was going to make the opening for the defense.  Fogleman said he would, and the court cautioned him not to testify but to set out in general who would be called as witnesses and what he anticipated the evidence would show.  Instead of doing this, Fogleman began with argumentative statements and ultimately told the jury that he was being silenced by the State and the court.  At that point, the circuit court revoked Fogleman's right to self-representation and his attorney concluded the trial, presenting witnesses and evidence in consultation with Fogleman.

¶23.    Fogleman's witnesses included Shane Sandridge's mother, individuals who sold the Camaro to Fogleman and who had worked on the Camaro prior to its sale,[11] individuals who had towed the vehicles, the dispatcher, and officers who took photos of the scene and retrieved the black box.  He called two doctors from South Alabama Medical Center who testified that Frederickson's injuries were caused by the collision, as well as a nurse who confirmed Fogleman's injuries.  Fogleman himself testified to his version of events.

¶24.    At the completion of all testimony, the court instructed the jury, and they retired to deliberate.  They sent out one question: "In Jury Instruction No. 9 and No. 10, 9 quotes 'serious bodily injury' and 10 quotes 'bodily injury.'  Are we debating serious bodily injury or simply causing injury?"  With no objection from the State or Fogleman, the court called

---

[11] This included Mike McMahan, who testified that the brake pads and rotors were replaced on the Camaro prior to its sale to Fogleman.

12

the jury in, told them that the court had received their note, and told them that the only response the court could give them was, "You have all of your instructions. Continue your deliberations."

¶25. The trial ended on February 13, 2020, when the jury found Fogleman guilty of all charges. On February 17, 2020, the circuit court judge sentenced Fogleman to forty years of incarceration on Count I (Frederickson's death); ten years of incarceration on Count II (Walker's injuries); and three years of incarceration on Count III (possession of a controlled substance). The sentence on Counts I and III run concurrently and the sentence on Count II runs consecutively to both. On February 20, 2020, Fogleman filed a Motion for New Trial and Judgment Notwithstanding the Verdict which the circuit court denied on March 2, 2020.

**ANALYSIS**

¶26. On appeal, Fogleman raises these issues: (1) whether there was sufficient evidence to support a lawful pursuit and a conviction for felony evasion; (2) whether the evidence was sufficient for a jury to find that Walker suffered serious bodily injury and whether the conviction on the Count as to her injuries was contrary to the weight of the evidence; (3) whether the jury was properly instructed on the element of serious bodily injury with respect to Walker's injuries (Count II); (4) whether the seizure and admission of the methamphetamine was lawful; and (5) whether the circuit court erred in revoking Fogleman's right to self-representation.

    **I.**     **Whether there was sufficient evidence to support a lawful pursuit and felony evasion.**

¶27. "In reviewing a challenge to the sufficiency of the evidence, the critical inquiry is

13

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parish v. State*, 176 So. 3d 781, 785 (¶13) (Miss. 2015). Here Fogleman argues that there was insufficient evidence to sustain his conviction of felony evasion of law enforcement because there was insufficient evidence to establish that Officer Kehoe had reasonable suspicion to initiate the attempted stop and subsequent pursuit.

¶28. Felony law-enforcement evasion is codified in Mississippi Code Annotated section 97-9-72 (Rev. 2014), which provides:

> (1) The driver of a motor vehicle who is given a visible or audible signal by a law enforcement officer by hand, voice, emergency light or siren directing the driver to bring his motor vehicle to a stop when such signal is given by a law enforcement officer acting in the lawful performance of duty who has a reasonable suspicion to believe that the driver in question has committed a crime, and who willfully fails to obey such direction shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed One Thousand Dollars ($1,000.00) or imprisoned in the county jail for a term not to exceed six (6) months, or both.

> (2) Any person who is guilty of violating subsection (1) of this section by operating a motor vehicle in such a manner as to indicate a reckless or willful disregard for the safety of persons or property, or who so operates a motor vehicle in a manner manifesting extreme indifference to the value of human life, shall be guilty of a felony, and upon conviction thereof, shall be punished by a fine not to exceed Five Thousand Dollars ($5,000.00), or by commitment to the custody of the Mississippi Department of Corrections for not more than five (5) years, or both.

> (3) Any person who is guilty of violating subsection (1) of this section, which violation results in serious bodily injury of another, upon conviction shall be committed to the custody of the Department of Corrections for not less than three (3) nor more than twenty (20) years of imprisonment.

> (4) Any person who is guilty of violating subsection (1) of this section, which violation results in the death of another, upon conviction shall be committed

14

to the custody of the Department of Corrections for not less than five (5) nor more than forty (40) years.

Fogleman was charged with violating subsection 3 for the injuries suffered by Walker and subsection 4 for the death of Frederickson. Fogleman argues that without sufficient proof of reasonable suspicion for Kehoe's decision to initiate a stop and thereafter a pursuit, Fogleman could not be found guilty of felony evasion.

¶29. "The crime of failing to yield to a law-enforcement officer requires the following: (1) a driver of a motor vehicle to be given a signal directing the driver to stop; (2) a law-enforcement officer acting in the lawful performance of his duty and with reasonable suspicion to believe that the driver has committed a crime; and (3) the driver to willfully fail to obey the law-enforcement officer's direction." *Johnson v. State*, 228 So. 3d 933, 936 (¶10) (Miss. Ct. App. 2017). The evidence presented by the State clearly established elements 1 and 3. Fogleman challenges the proof of element 2.

¶30. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 935-36 (¶6) (quoting *Woods v. State*, 175 So. 3d 579, 581 (¶13) (Miss. Ct. App. 2015)). "Whether probable cause or reasonable suspicion [for a traffic stop] exists is subject to a de novo review." *Casey v. State*, 302 So. 3d 617 (¶16) (Miss. 2020). The Mississippi Supreme Court has said that the law is well settled that if an officer personally observes a traffic violation, that is sufficient proof of the requisite cause for a stop. *Id.* at 625 (¶21); *Johnson*, 228 So. 3d. at 936 (¶6).

¶31. In this case, Officer Kehoe testified that he first observed the Camaro doing a

15

"burnout," which Kehoe considered careless driving. Officer Kehoe's credibility was bolstered by the fact that both Sandridge and Fogleman confirmed that the Camaro burned out in this fashion. Sandridge said that the engine stalled, and when it caught traction, the tires squealed; Fogleman said Sandridge revved the engine and popped the clutch. Both also confirmed that: later, after they stopped and turned at a stoplight, Officer Kehoe activated his blue lights and siren. The dash-cam captured Officer Kehoe's initial actions following the burnout: when he initiated his lights and siren, the driver's failure to stop, and the subsequent high-speed chase that occurred. The driver's speeding and the failure to have a tag conspicuously displayed were both traffic violations[12] that Officer Kehoe witnessed and which justified his decision to make the traffic stop. Fogleman did not dispute either of these traffic violations. Therefore, Officer Kehoe's personal observations of these traffic violations were sufficient to establish probable cause for the traffic stop.[13]

¶32. We have found probable cause existed to initiate a traffic stop under circumstances less compelling than in this case. In *Carter v. State*, 227 So. 3d 416 (Miss. Ct. App. 2017), we approved a police pursuit that occurred when a deputy observed and followed a car that did not have a light illuminating its license plate. *Id.* at 418 (¶1). When the driver stopped

---

[12] "Failure to conspicuously display a tag in such a manner that it may easily be read is an offense under Mississippi Code Annotated section 27-19-323 (Rev. 2006)." *Gonzales v. State*, 963 So. 2d 1138, 1143 (¶23) (Miss. 2007). Also, a deputy who believes a vehicle is speeding has probable cause to initiate a stop. *Hynes v. State*, 151 So. 3d 1063, 1066 (¶12) (Miss. Ct. App. 2014).

[13] Even if the "burnout" were not a traffic violation, it certainly was a sufficient basis for Officer Kehoe to be suspicious and follow the Camaro. Thereafter, Kehoe definitely witnessed the subsequent traffic violations.

and obstructed traffic behind him, the deputy activated his blue lights and siren. *Id.* Carter sped away, and a high speed pursuit ensued. *Id.* A jury convicted Carter under the same felony-evasion statute, *id*. at (¶3), that Fogleman faced. Carter challenged the reasonableness of the deputy's decision to stop him and whether the deputy had probable cause to arrest him. *Id.* at 421-22 (¶¶15-16). Quoting *Goff v. State*, 14 So. 3d 625, 641 (¶48) (Miss. 2009), we said that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Carter*, 227 So. 3d at 422 (¶16). We noted that it was sufficient that the deputy had witnessed Carter commit two traffic violations: (1) his license plate was not illuminated, and (2) he was obstructing traffic. *Id.*

¶33. In this case, there was undisputed evidence that when Officer Kehoe activated his lights and siren, the driver of the Camaro was given a signal to stop, satisfying the first element of felony evasion. Further there is undisputed evidence that the driver of the Camaro willfully failed to obey Officer Kehoe's direction to stop and sped away. Finally, we find that when Officer Kehoe witnessed two undisputed traffic violations—speeding and failure to display a license—he was acting in the lawful performance of his duty and with reasonable suspicion to believe that the driver had committed a crime. Therefore, there was sufficient evidence for each element of felony evasion for a jury to convict Fogleman, whom they found was the driver of the Camaro.

    **II.    Whether the evidence was sufficient that Walker suffered any serious bodily injury and whether the verdict in Count II is contrary to the overwhelming weight of the evidence.**

¶34. Under Mississippi Code Annotated section 97-9-72(3), a person who eludes law

enforcement and, in doing so, causes "serious bodily injury" to another is guilty of a felony. A jury found Fogleman violated this statute when he caused such injury to Walker, the driver of the vehicle that Frederickson hit when Fogleman's Camaro hit him. Fogelman contends that there was insufficient proof to show that Walker's injuries were serious.

¶35. Fogleman argues that the cases of *Fleming v. State*, 604 So. 2d 280 (Miss. 1992); *Rickman v. State*, 150 So. 3d 983 (Miss. Ct. App. 2014); and *Truelove v. State*, 78 So. 3d 363 (Miss. Ct. App. 2011), all provide examples of a "serious bodily injury." In *Fleming*, the victim suffered a scalp laceration, a non-displaced fracture of his left jaw, and a fracture to his forearm as a result of his assault. *Fleming*, 604 So. 2d at 283. In *Rickman*, an inmate's assault on a jailer resulted in left eye damage, a broken nose, and a fractured hip and pelvic bone. *Rickman*, 150 So. 3d at 985 (¶4). In *Truelove*, a wife suffered a broken nose, concussion and broken ribs. *Truelove*, 78 So. 3d at 367 (¶20). In all three cases, serious bodily injury was defined as "bodily injury [that] creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Rickman*, 150 So. 3d at 986 (¶12). We agree that the injuries in those cases were found to constitute "serious bodily injury." But the Mississippi Supreme Court in *Fleming*, which cited *Colburn v. State*, 431 So. 2d 1111, 1114 (Miss. 1983), said:

> It is obvious that the Court in *Colburn* was not attempting to establish a minimum threshold for what constitutes "serious bodily injury." Rather, the Court was simply stating that an attack which caused "great risk of death" was so clearly within the realm of "aggravated" assault that an instruction concerning "simple" assault was unnecessary. The Court surely was not implying that an aggressor must beat his victim to within an inch of his life in order to be found guilty of aggravated assault.

18

*Fleming*, 604 So. 2d at 291.

¶36.	In an aggravated-assault case, *Bright v. State*, 986 So. 2d 1042, 1048 (¶24) (Miss. Ct. App. 2008), we held that the extent of a victim's injuries is a question for the jury. In that case, the evidence showed that Bright had punched and kicked Woods. *Id*. at 1047 (¶¶18-19). The victim suffered broken bones in his face. *Id*. at 1045 (¶8). We noted that "aggravated assault under section 97-3-7(2)(a) and simple assault under 97-3-7(1)(a) are distinguished mainly by the extent of the victim's injury, i.e., whether the victim suffered 'bodily injury' or 'serious bodily injury.'" *Id.* "Whether 'bodily injury' or 'serious bodily injury' resulted is a question for the jury." *Id.*

¶37.	In *Bright*, we cited *Odom v. State*, 767 So. 2d 242 (Miss. Ct. App. 2000). In that case, Bright was involved in a fight at a club. *Id.* at 243 (¶2). He allegedly hit the victim in the face and kicked him. *Id.* The victim was taken to the hospital with a swollen left eye and blood coming from his left ear. *Id.* at 244 (¶3). Ultimately, his treating doctor said the victim's injuries were not life-threatening. *Id.* Bright was charged and indicted for aggravated assault, but a jury convicted him of simple assault. *Id*. at (¶4). On appeal, Bright argued that his motion for a directed verdict on the aggravated-assault charge should have been granted and the case dismissed because the victim did not suffer serious bodily injury. *Id.* at 245 (¶7). We determined that the circuit court committed no error in denying the motion because the elements of simple assault are necessarily contained within the more serious offense, and a reasonable jury could have found Bright guilty of simple assault. *Id.* at 246 (¶11). Concerning the issue of the extent of the victim's injury, we said:

Inasmuch as the State presented a witness claiming there was serious bodily injury, and the defense brought forth a witness that the injuries were not serious, there was presented a classic jury question, and the trial judge was proper in not granting a directed verdict on the aggravated assault charge and granting a simple assault instruction.

*Id.* at 246 (¶13).

¶38. In this case, Walker testified that although she was able to exit the vehicle and crawl across the street, she immediately felt pain on her left side, ankle, knee, and lower back. She was taken to the hospital by ambulance to be evaluated. Fortunately, x-rays revealed no new injuries, but Walker, who herself is a nurse, testified that collision exacerbated a prior back injury. In her testimony at trial in 2020, five years after the collision, she testified that she still suffered from her injuries:

Q. Do you have any lasting effects from this injury?

A. I do.

Q. If you would, describe those.

A. Lower back pain, especially after sitting or standing for a length of time. Today would be a great example. The knee, when I say it goes out, I mean the weakness of it. The entire leg is basically weaker than the right leg. And my ankle, when they did the x-ray, they, quote, unquote, found nothing wrong with it, per se, but it still does swell. So I have Ibuprofen that I take for that. Of course, different exercises that I do for my lower extremities. There's a cream that I use that's called diclofenac that I use also.

Q. And it's a what?

A. It's by prescription only.

Q. You said there's a what you take?

A. Diclofenac. It's a cream.

Ms. Walker testified to suffering from a permanent injury as a result of the collision for which she still experienced physical symptoms and for which she had to use prescription medication. Whether this constitutes a "serious bodily injury" was in the province of the jury, not this court. Accordingly, we find no merit to Fogleman's claim that Walker did not suffer serious bodily injury.

### III. Whether the jury was properly instructed on the element of serious bodily injury in Count II.

¶39. Fogleman argues that jury instructions confused the jury, as shown by the jury's question during deliberations: "In Jury Instruction No. 9 and No. 10, 9 quotes 'serious bodily injury' and 10 quotes 'bodily injury.' Are we debating serious bodily injury or simply causing injury?" Fogleman argues that the flaw causing this confusion was found in the instruction on the lesser-included offense which used the term "bodily injury" instead of "serious bodily injury." After examining the jury instructions and relevant precedent, we find no merit to Fogleman's argument.

¶40. The instruction on Count II of the indictment (violation of Miss. Code Ann. §97-9-72 (3)), names the offense as "Failing to stop . . . and causing injury," but the instruction goes further and contains the elements of the crime, including the element of causation of "serious bodily injury":

Jury Instruction No. 6

The Court instructs the Jury that the Defendant, JEREMY SHANE FOGLEMAN, has been charged by in Count II of the Indictment with the crime of *FAILURE TO STOP A MOTOR VEHICLE PURSUANT TO SIGNAL OF LAW ENFORCEMENT OFFICER CAUSING INJURY.*

21

If you find from the evidence in this case beyond a reasonable doubt that:

1. On or about July 8, 2015 in the First Judicial District of Harrison County, Mississippi;
2. The Defendant, JEREMY SHANE FOGLEMAN, did willfully, unlawfully, and feloniously, while operating a motor vehicle,
3. Fail to stop such vehicle after being given a visible or audible signal by a Law Enforcement Officer by emergency light or siren directing him to bring his motor vehicle to a stop;
4. When such signal was given by a Law Enforcement Officer acting in the lawful performance of a duty who had reasonable suspicion to believe that JEREMY SHANE FOGLEMAN has committed a crime;
5. Which failure resulted in the **serious bodily injury** of Cassandra Renee Walker;

Then you shall find the Defendant, JEREMY SHANE FOGLEMAN, Guilty of Failure to Stop a Motor Vehicle Pursuant to Signal of Law Enforcement Officer Causing Injury, Count II.

If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the Defendant, JEREMY SHANE FOGLEMAN, not guilty of Failure to Stop a Motor Vehicle Pursuant to Signal of Law Enforcement Officer Causing Injury, Count II.

(Emphasis added). The jury was also given an instruction defining "serious bodily injury"

which read:

Jury Instruction No. 9

The Court instructs the jury that to find the Defendant, JEREMY SHANE FOGLEMAN guilty of Failure to Stop a Motor Vehicle Pursuant to a Signal of a Law Enforcement Officer Causing Serious Bodily Injury in Count II of the Indictment, the jury must find beyond a reasonable doubt that Cassandra Renee Walker suffered "serious bodily injury" as a result of the accident of July 8, 2015. "Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

If you do not find from the evidence beyond a reasonable doubt that

22

Cassandra Renee Walker suffered serious bodily injury, then you must find the Defendant, JEREMY SHANE FOGLEMAN, not guilty of Failure to Stop a Motor Vehicle Pursuant to a Signal of a Law Enforcement Officer Causing Serious Bodily Injury.

The instructions also included one on the lesser-included offense of violation of section 97-9-72 (1) (failing to stop for law enforcement resulting in no injury), which again referred to the name the court had given to Count II. It read:

Jury Instruction No. 10

If the State has failed to prove all of the essential elements of the crime of *Failure to Stop a Motor Vehicle Pursuant to the Signal of Law Enforcement Officer Causing Injury, Count II,* you may consider the lesser charge of Failure to Stop a Motor Vehicle Pursuant to the Signal of Law Enforcement Officer. However, it is your duty to accept the law given to you by the Court; and if the facts and the law warrant a conviction of the crime of *Failure to Stop a Motion Vehicle Pursuant to the Signal of Law Enforcement Officer Causing Injury*, then it is your duty to make such finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime.

If you find from the evidence beyond a reasonable doubt that:

1. On or about July 8, 2015 in the First Judicial District of Harrison County, Mississippi;
2. The Defendant, JEREMY SHANE FOGLEMAN, did willfully, unlawfully, and feloniously, while operating a motor vehicle,
3. Fail to stop such vehicle after being given a visible or audible signal by a Law Enforcement Officer by emergency light or siren directing him to bring his motor vehicle to a stop;
4. When such signal was given by a Law Enforcement Officer acting in the lawful performance of a duty who had reasonable suspicion to believe that JEREMY SHANE FOGLEMAN has committed a crime;

Then you shall find the Defendant, JEREMY SHANE FOGLEMAN, Guilty of Failure to Stop a Motor Vehicle Pursuant to Signal of Law Enforcement Officer, Count II.

If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the Defendant, JEREMY SHANE FOGLEMAN, not guilty of Failure to Stop a Motor Vehicle Pursuant to Signal of Law Enforcement Officer, Count II.

(Emphasis added). Fogleman contends that this instruction for the lesser-included offense did not specify whether injury was required or not. It merely states that if the State has failed to prove all of the essential elements of *Failure to Stop a Motor Vehicle Pursuant to the Signal of Law Enforcement Officer Causing Injury*, *Count II*, the crime described in Instruction 6, the jury could consider conviction of a lesser offense. Fogleman argues that the jury must have been confused when reading the jury instructions as a whole and thought that any injury, whether serious or not, allowed for a conviction under Count II. We disagree.

¶41. The record reflects Fogleman requested a lesser-included offense instruction, and the State and the Court agreed. The State offered to draft one, which was reviewed by Fogleman's attorney, who announced that he had no objection to the proposed instruction, which became Jury Instruction No. 10. Fogleman had no objection to Instruction No. 9 and proposed what became Instruction No. 6.

¶42. First, Fogleman's challenge to the instructions is procedurally barred from consideration on appeal because Fogleman did not object to them at trial. "This Court has held on numerous occasions that an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal." *Young v. State*, 194 So. 3d 904, 910 (¶20) (Miss. Ct. App. 2016). We may only review them then for "plain error." *Id.* "To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule,

24

whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial." *Galloway v. State*, 122 So. 3d 614, 630 (¶18) (Miss. 2013). An appellate court will find plain error "only where a fundamental right of the defendant has been violated." *Fitzpatrick v. State*, 175 So. 3d 515, 522 (¶31) (Miss. 2015).

¶43.    The only "fundamental right" Fogleman raises was his right to a jury that was not confused, citing *Nicolaou v. State*, 534 So. 2d 168 (Miss. 1988). However, *Nicolaou* involved an instruction that the circuit court formulated in response to a jury question. *Id.* at 174. Moreover, Nicolaou objected to the instruction at trial. *Id.* Other than citing the need to avoid jury confusion with a supplemental instruction fashioned by the court on the fly, we fail to see the relevance of *Nicolaou* to the facts of this case.

¶44.    Factually, Fogleman's argues that the reference to mere "bodily injury" in the introductory paragraph in the lesser-included offense instruction caused the jury to render a verdict that Fogleman was guilty of Count II because they found that Walker suffered only "bodily injury" and not "serious bodily injury." But Fogleman provides no proof that this jury made such a finding. Moreover, the jury rendered its verdict in the format provided in the form of the verdict instruction, Jury Instruction No. 17, which was formulated by the circuit court without objection.[14] Proposed Instruction C-7A became Jury Instruction 17 which read in part:

---

[14] Initially, the circuit court fashioned Proposed Instruction C-7, which instructed the jury how to report its verdict. C-7 did not include a manner for the jury to report a verdict on the lesser-included offense that Fogleman had requested and the court had given. The court then revised C-7 to include the lesser-included offense instruction, and C-7A was presented to the parties. Neither the State nor Fogleman voiced any objection to it.

**As to Count II for Defendant Jeremy Shane Fogleman:**

If you find the Defendant, Jeremy Shane Fogleman, guilty of **Failure to Stop Motor Vehicle Pursuant to Signal of Law Enforcement Officer Causing Injury-Count II**, the form of your verdict shall be:

**"We, the jury find the Defendant, Jeremy Shane Fogleman, guilty of Failure to Stop Motor Vehicle Pursuant to Signal of Law Enforcement Officer Causing Injury-Count II."**

OR

If you find the Defendant, Jeremy Shane Fogleman, not guilty of **Failure to Stop Motor Vehicle Pursuant to Signal of Law Enforcement Officer Causing Injury-Count II**, the form of your verdict shall be:

**"We, the jury find the Defendant, Jeremy Shane Fogleman, not guilty of Failure to Stop Motor Vehicle Pursuant to Signal of Law Enforcement Officer Causing Injury-Count II."**

(Emphasis added). Again, as in other instructions, the court used the name it gave to the offense embodied in Count II, not the elements of the crime. "Jurors are presumed to follow the court's instructions," *Gales v. State*, 299 So. 3d 861, 869-70 (¶26) (Miss. Ct. App. 2020), and in this case, they did. Following Jury Instruction No. 17, the jury reported that it found Fogleman guilty of "failure to stop motor vehicle pursuant to signal of law enforcement officer causing injury - Count II." The jury had clearly been properly instructed on the requisite elements of the crime in Count II, including the element of "serious bodily injury," in Jury Instruction No. 6. They were also given a definition of that term in Jury Instruction No. 9. "This Court reviews jury instructions as a whole." *Johnson v. State*, 252 So. 3d 597, 599 (¶8) (Miss. Ct. App. 2017). Thus, we find the jury followed the instructions given,

26

which adequately and correctly described the elements of Count II.

¶45. In this case, Fogleman presents no proof of jury confusion, other than the one question they asked during deliberations. Unlike *Nicolaou*, the circuit court here did not attempt any further instruction. Upon rendering their verdict against Fogleman, the jury was polled and all twelve jurors agreed. "Jury instructions are generally within the discretion of the trial court[,] and the settled standard of review is abuse of discretion." *Johnson*, 252 So. 3d at 599 (¶8). We will not reverse the trial court when the jury instructions, "taken as a whole, fairly—although not perfectly—announce the applicable primary rules of law." *Id.* In *Galloway*, 122 So. 3d at 635 (¶39), where the jury made an inquiry during deliberations and the circuit court's response was similar to the circuit court's in this case, we held that "[w]hen the instructions, together, fully and accurately informed the jury of state law, the trial court did not err in directing the jury to review these instructions." Following these principles of analysis of jury instructions, we find that the instructions in this case accurately covered the elements of the crimes charged and that Fogleman's claim that the jury was not properly instructed has no merit.

### IV. Whether the seizure and admission of the methamphetamine was "fruit of the poisonous tree."

¶46. Before trial, Fogleman filed an unsuccessful motion to suppress the admission of the methamphetamine that law enforcement found in the Camaro. After hearing testimony from Officers Kehoe and Guillot, as well as Sandridge, the circuit court denied the motion to suppress, finding that there was probable cause for the stop and that there was reason to perform an inventory search of the vehicles after the collision. On appeal, Fogleman argues

27

that the seizure of the methamphetamine was the product of a pursuit without reasonable suspicion.[15]

¶47.    "When reviewing a trial court's denial of a motion to suppress, an appellate court employs a 'mixed standard of review.'" *Dies v. State*, 926 So. 2d 910, 917 (¶20) (Miss. 2006). "Determinations of reasonable suspicion and probable cause should be reviewed de novo." *Id*. "A trial court's decision to admit or exclude evidence is reviewed under the abuse-of-discretion standard." *Lee v. State*, 100 So. 3d 982, 984 (¶8) (Miss. Ct. App. 2012).

¶48.    Under the Fourth Amendment, an individual has the right to be protected from warrantless searches and seizures.  *Hynes v. State*, 151 So. 3d 1063, 1066 (¶13) (Miss. Ct. App. 2014).  But there are exceptions, "including a consensual search, a search incident to arrest, an inventory search, a search under exigent circumstances if probable cause exists, and a search of a vehicle when making a lawful contemporaneous arrest." *Id*. (quoting *Bradley v. State*, 934 So. 2d 1018, 1022 (¶7) (Miss. Ct. App. 2005)).  "To determine whether the search and seizure were unreasonable, the inquiry is two-fold: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Hynes*, 151 So. 3d at 1066

---

[15] Fogleman does not challenge the legality of the inventory search that the officers conducted.  The law is clear that "it is permissible for officers to conduct an inventory search of a vehicle when the circumstances require it to be impounded. . . ." *Lattimore v. State*, 37 So. 3d 678, 684 (¶21) (Miss. Ct. App. 2010) (quoting *Logan v. State*, 987 So. 2d 1027, 1031 (¶14) (Miss. Ct. App. 2008) (quoting *Black v. State*, 418 So. 2d 819, 821 (Miss. 1982))). In this case, none of the vehicles involved in the collision were drivable, and they required towing.  There was testimony that it is Gulfport Police Department's policy to conduct an inventory search in such circumstances.  Therefore, the inventory search performed on the Camaro was lawful, and the methamphetamine was admissible under that principle.

(¶10).

¶49.    In this case, we have held that Officer Kehoe had reasonable suspicion and probable cause to stop Fogleman, meeting the first prong of the test.  Moreover, the subsequent search of the vehicle was reasonable given the circumstances in light of the vehicles' conditions and departmental policy.  Therefore, the search of the Camaro did not violate Fogleman's Fourth Amendment rights.

¶50.    This case is similar to *Cameron v. State*, 175 So. 3d 574 (Miss. Ct. App. 2015), where we dealt with a challenge similar to Fogleman's.  In that case, Police Officer Ainsworth received a dispatch call that a driver was operating a GMC Sierra truck carelessly.  *Id*. at 574 (¶3).  Ainsworth himself saw the truck swerve when it left a McDonald's restaurant, causing Officer Ainsworth to stop the truck.  *Id.*  Officer Ainsworth smelled alcohol and observed Cameron's blood-shot eyes.  *Id.*  Cameron failed a field sobriety test and Officer Ainsworth arrested him.  *Id.* at (¶4).  At the station, Cameron failed to cooperate when Ainsworth attempted a breathalyzer test and Officer Ainsworth reported that "no sample was given." *Id.*  On appeal, Cameron argued that there was no probable cause for the stop; thus any evidence obtained thereafter was obtained in violation of his Fourth Amendment rights.  *Id.* We set out the parameters of his rights, saying:

> Traffic stops are Fourth Amendment seizures.  And the "fruit of the poisonous tree" doctrine "makes inadmissible tangible evidence obtained incident to an unlawful search or seizure." So if Cameron's traffic stop was unreasonable, then the evidence obtained as a result of the stop would be subject to this exclusionary rule.

*Id*. at 577 (¶8).

29

But we found that after receiving the dispatch report, the officer saw Cameron's truck veer between the lanes of traffic as it swerved out of the McDonald's. Cameron's reckless driving was also caught on the officer's dash-cam video. *Id.* at 577 (¶9). We held that the "evidence was sufficient to support a finding that the officer had probable cause to stop the defendant, and thus, that the fruit of the poisonous tree's exclusionary rule did not apply." *Id.* Likewise, in this case, Officer Kehoe had probable cause to stop and arrest Fogleman and, given the circumstances, the search of the vehicle was lawful.

¶51. It is irrelevant that the methamphetamine found was unrelated to Fogleman's crimes of felony evasion. "It is of no moment that the evidence obtained as a result of the search incident to a defendant's arrest for a particular crime is not related to that charge, but [which] created probable cause for a subsequent arrest on a wholly different charge." *Lee*, 100 So. 3d at 985 (¶11) (quoting *Rankin v. State*, 636 So. 2d 652, 657 (Miss. 1994)). In this case, the search of the Camaro was lawful and the methamphetamine was not "fruit of the poisonous tree" as Fogleman claims.

     **V.    Whether the circuit court erred in revoking Fogleman's right to self-representation.**

¶52. The right to counsel found in the Sixth Amendment may be waived, *Patton v. State*, 34 So. 3d 563, 564 (¶3) (Miss. 2010), and a defendant has the right to represent himself under both the United States and Mississippi constitutions. *Id.*; *Coleman v. State*, 914 So. 2d 1254, 1255 (¶4) (Miss. Ct. App. 2005). But this right is not unfettered. The Mississippi Supreme Court has articulated two exceptions to this rule, namely: "(1) where the defendant is so unable or unwilling to abide by rules and courtroom procedure that his representation

30

of himself would result in disruption of the trial; and (2) where the defendant is so physically or mentally incompetent to speak to the jury that his right to a fair trial is endangered." *Coleman*, 914 So. 2d at 1255 (¶4) (quoting *Armstead v. State,* 716 So. 2d 576, 582 (¶25) (Miss. 1998). We review this issue de novo.

### A. The Circuit Court's Grant of Self-Representation

¶53. Soon after Fogleman's arrest, the circuit court appointed Charles Stewart to represent him. Despite this appointment, Fogleman filed discovery and motions pro se. On October 3, 2016, Fogleman asked for more time to retain an attorney. On October 18, 2016, the circuit court held a "Status of Attorney" proceeding, during which Fogleman advised the court that he did not want Stewart to represent him but that he wanted to represent himself. The circuit court told Fogleman that he had a right to do that, but he reviewed with Fogleman the parameters of that self-representation:

> THE COURT: All right. Now then, you understand that you can conduct a part of your defense, as much of your defense as you want to even if you have an attorney. In other words, if you just wanted the attorney to cross-examine one witness, you could do that? You understand that?
>
> THE DEFENDANT: Yes, I understand.
>
> THE COURT: But regardless of what your decision is, any part of the defense that you conduct, you know that you have to follow the same rules as the attorneys, correct?
>
> THE DEFENDANT: Yes, I do, Your Honor.
>
> THE COURT: And you understand that I cannot relax those rules for you just because you're representing yourself?
>
> THE DEFENDANT: Yes, Your Honor.

31

THE COURT: Nor can I help you in anyway or give you any advice. In other words, I can't say, gee, Mr. Fogleman, you really ought to file a motion to do XYZ or that's not the right rule or, you know, you didn't make the objection the right way. I can't give you any hints, helps, advice of any kind. You understand that?

THE DEFENDANT: I understand, Your Honor.

THE COURT: Anymore than I would any of lawyers.

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Now, you also understand that you would have to be bound by and conduct yourself by all of the same rules of behavior, of conduct in other words, that the attorneys do in the courtroom, correct?

THE DEFENDANT: Yes, of course, Your Honor.

By order on that date, the circuit determined that Fogleman understood the consequences of self-representation and freely, voluntarily, and knowingly chose to exercise that rights. But the circuit court did appoint Attorney Jim Davis as "stand by" counsel to assist Fogleman.

¶54. From our review of the record, we find that the circuit court appropriately granted Fogleman the right to represent himself in accordance with Rule 8.05 of the Uniform Rules of Circuit and County Court Practice in effect at the time.[16] Under that rule, and *Patton*, the court is required to make a finding, on the record, that the waiver of representation by counsel was knowingly, intelligently, and voluntarily made. *Patton*, 34 So. 3d at 565-67 (¶7). The circuit court here held a hearing and made such a finding, and over several years of the pre-trial proceedings and even the first half of the trial, Fogleman exercised that right.

      B.      *The Circuit Court's Revocation of Fogleman's Right to*

---

[16] This rule is now contained in Rule 7.1(e) of the Mississippi Rules of Criminal Procedure, effective July 1, 2017.

*Self-Representation*

¶55.   Throughout his pre-trial proceedings, including the motion to suppress evidence, Fogleman represented himself with the aid of his appointed counsel.  The court allowed him to cross-examine witnesses and make objections to testimony.  During numerous pre-trial hearings, the circuit court patiently listened to Fogleman's arguments on even extraneous issues, such as Fogleman's request that the State produce a 2014 dash-cam video of him in an entirely different case to allegedly show the difference in the quality of the video from the one generated in this case in July 2015:

> THE COURT: They gave you what they have. Now you want something else from '14. What is the relevance of something that happened in '14?
>
> MR. FOGLEMAN: Let's compare that video to what they have and it'll show the difference in quality. It was shot with the same camera, that's supposed to be depicting the same sort of thing, and we're going to show how far different they are.
>
> THE COURT: Okay.
>
> MR. FOGLEMAN: And that goes on to the list of the outstanding stuff that they're supposed to produce. One of them being their in-car camera policy, which would show how all those videos are preserved in a real format to where they could produce it, and that's one of the reasons why they haven't produced that. Same as why the couple of photographs they're telling me the stuff was ordered are pictures of the brakes, and they haven't produced that.  Just for the same reason. Trying to bury the truth.
>
> THE COURT: All right. State.
>
> MR. BURRELL: Judge, I don't see, again, relevancy of this. This happened -- Mr. Fogleman was apparently shot August 22nd of '14. It was presented to the grand jury. No true bill in December of '15. It has absolutely nothing to do with this case, Judge. It's just a complete waste of time to even entertain this. It's not relevant whatsoever to this case at all, Judge.

33

THE COURT: All right. Mr. Fogleman, anything else you want to say about that?

MR. FOGLEMAN: As far as no true bill, the shooter was positively identified, and it ties into that Florida case which we were talking about, why I was shot in retaliation for turning in those other officers which were later indicted and arrested, all came back down from it. The whole reason they framed me up on those cases from Florida, in which if we had the whole paper trail, we could show it. The reason there was no true bill is because there was probably something behind the scene. I positively identify the shooter and get no true bill. How does that happen? Only in a Harrison county courtroom.

THE COURT: Okay. It's denied. What happened in 2014 has no relevance as to what happened in 2015.

¶56. But by the morning of the trial, the court's patience for Fogleman's behavior was tested because the court has an obligation to keep control of its courtroom and what a jury should and should not hear. Outside the presence of the jury, the court heard Fogleman's motion to suppress the dash cam video. Fogleman questioned the witnesses, and the court sustained several of his objections. Finally, this exchange occurred when the video was played for the court:

MR. FOGLEMAN: We're into it 33 seconds. He's trying to cover up the gap where . . .

THE COURT: Start it over at the original—

MR. FOGLEMAN: Thank you. Thank you, Your Honor.

THE COURT: [A]gain. Start it over at the original part again. That's the original?

MR. BURRELL: That's the beginning, Your Honor.

THE COURT: That's the beginning again.

(PLAYING VIDEO.)

34

MR. FOGLEMAN: Your Honor, I'm going to have to object again. This is—

THE COURT: It's overruled. I'm—

MR. FOGLEMAN: This is not the same video—

THE COURT: It's overruled.

MR. FOGLEMAN: that's been produced in discovery. This is not what was produced –

THE COURT: Have a seat. Have a seat. Turn it off. Turn it off right now.

MR. BURRELL: Yes, Your Honor.

THE COURT: Mr. Fogleman, you're being disruptive again. At every hearing, you've been disruptive. Now, I am going to tell you one more time that you are not to be disruptive. I don't want to take you out of the courtroom, but I can. I can relieve you of your right to represent — to represent yourself, and this is not for argument.

Fogleman further claimed that he had just received videos the day before and could not review them with his attorney. But his counsel told the court that he had received the videos two years before, and just two weeks earlier, he had spent five hours reviewing them and the other evidence with Fogleman.

¶57. After selecting the jury, the court allowed Fogleman to cross-examine the witnesses presented by the State, although the court had to repeatedly caution Fogleman about what the court considered inappropriate courtroom protocol.[17]

¶58. During the trial, the court had to frequently caution Fogleman about questions that

---

[17] For example, during the State's questioning of the first witness, Fogleman objected to the admission of the dash cam video and started to argue his objection. The court excused the jury and told Fogleman: ". . .You objected, and now I need to hear your basis, but you don't need to say it in front of the Jury."

really constituted testimony or remind him of the procedures, for example:

> THE COURT: All right. Mr. Fogleman, I have been more than patient with you, and I've told you on numerous occasions when somebody objects, stop. You insist on continuing to testify and not obeying the court's orders.

¶59.    But Fogleman did not comply.  For example, in a prior hearing on the issue, the circuit court had ruled that Fogleman could not ask Investigator Clark whether she was under investigation for manufacturing evidence because Fogleman had no proof of this.  Yet during Investigator Clark's testimony, Fogleman still asked the question, incurring a final warning from the court:

> MR. FOGLEMAN: And I had asked you in that short time as a detective whether or not you've ever been under investigation for manufacturing evidence?
>
> MR. BURRELL: Objection, Your Honor. This is exactly—
>
> THE COURT: [S]ustained. I told you not to ask that question. Sustained. Move on. Disregard that question.
>
> MR. FOGLEMAN: I think we need to approach.
>
> (BENCH CONFERENCE REPORTED.)
>
> MR. FOGLEMAN: Mr. Burrell had rattled off a list of things saying that I could not ask.
>
> THE COURT: I told you not to do it. I did.
>
> MR. FOGLEMAN: [W]hat he brought up -what I said as far as manufacturing evidence I can prove because she testified in the affirmative to it in the preliminary. . .
>
> THE COURT: I've ruled.
>
> MR. FOGLEMAN: She's been under investigation multiple times and –

THE COURT: It's irrelevant. I told you, no. Get the jury out. Back off. Sit down.

(END OF BENCH CONFERENCE.)

(JURY OUT.)

THE COURT: We had a hearing. I ruled on it. You know you were not supposed to ask any question about that. You're in contempt. We'll deal with that later.

MR. FOGLEMAN: Can we—

THE COURT: No. There's nothing to hear from you. You did it in open court, disregarded what I told you. You're in contempt.

MR. FOGLEMAN: Can we look back at what was said when we discussed that—

THE COURT: No. I just found you in contempt. You got ten minutes. Don't speak to anyone. You can't ask it. . . .

(PAUSE IN THE PROCEEDINGS.)

THE COURT: We are back on the record.  Now, this, Mr. Fogleman, is your final warning. If you ignore a Court's previous ruling and order one more time you will no longer be representing yourself. You will no longer be asking questions. You can consider this as your warning. Mr. Davis, you'll be taking over.

¶60.    After the State rested, the circuit court asked Fogleman if he wanted to make the opening statement for the defense and then cautioned him if he did:

THE COURT: Do you wish to do the opening?

MR. FOGLEMAN: Yes, Your Honor.

THE COURT: I'm cautioning you again, you get up and start telling them what you want to say as far as testimony—opening statement is what you hope to prove. You start testifying, you're going to be subject to cross-examination. You won't get to make      that decision. I will.

Okay?

MR. FOGLEMAN: Yes, Your Honor.

THE COURT: If you don't understand what I said, ask Mr. Davis.

¶61.   Unfortunately, Fogleman did not follow the circuit court's order and the following ensued:

MR. FOGLEMAN: Good morning, ladies and gentlemen of the jury. Thank you for bearing with me up to this point. You see that I'm here representing myself.  It's my opinion it takes some guts—

MR. JOSEF:  Objection, your honor

THE COURT: Sustained.

BY MR. FOGLEMAN:   You may wonder why I feel it's up to me –

MR. JOSEF: Objection, Your Honor. Personal opinions –

THE COURT: It's sustained.

BY MR. FOGLEMAN: I am here to stand up and bring light to the dark—

MR. JOSEF: Objection, Your Honor. This is improper.

THE COURT: Sustained. It's improper opening statement.

BY MR. FOGLEMAN: I believe in trusting the Lord with all my heart –

MR. JOSEF: Objection, Your Honor. This is also improper. This is a roadmap. He is supposed to tell what the evidence is going to—

THE COURT: This is not argument. Give them a roadmap.

MR. FOGLEMAN: I just want to give a couple minute kind of introduction and then we will get into that and close out.

THE COURT: This is your introduction.  What you're doing is improper. Go ahead. Start.

BY MR. FOGLEMAN: The truth is discovered, not invented. It exists independent of anyone's knowledge of it. Truth is transcultural. If something is true, it's true for all people at all times.

MR. JOSEF: Objection, Your Honor. Again, this is argument.

THE COURT: This is argument. Move on.

BY MR. FOGLEMAN: What we're going to see coming up here on my part of the case is we're going to see that I've been stonewalled and obstructed at every turn . . .

MR. JOSEF: [O]bjection, Your Honor.

THE COURT: Sustained. Disregard.

BY MR. FOGLEMAN: We're going to see how anytime I attempt to ask a question or say something I'm silenced. . .

MR. JOSEF: [O]bjection, Your Honor.

THE COURT: Sustained. Take the Jury out.

MR. JOSEF: He should be told to sit down.

THE COURT: Take the jury out. Be seated.

(JURY OUT.)

THE COURT: Mr. Fogleman, you've crossed the line. You've disrupted this trial on numerous occasions. I've warned you probably more times than I should, but I tried to give you the benefit of the doubt. I've warned you no less than ten times, maybe more. You crossed the line again. Your right to represent yourself is now revoked, and Mr. Davis is now going to try the rest of the case. You can give your opening, Mr. Davis.

¶62. "The trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. . . . The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with

39

relevant rules of procedural and substantive law." *Faretta v. California,* 422 U.S. 806, 834 n.46 (1975). The Mississippi Supreme Court has held that "the defendant who argues pro se, of course, is not exempt from following the rules of court procedure, and must confine his remarks to the evidence in the record." *Armstead v. State*, 716 So. 2d 576, 580 (¶17) (Miss. 1998). To balance a defendant's right against self-incrimination and his right to self-represent, the court should "warn him that if he makes unsupported statements, those statements will be treated as a 'partial waiver' of his privilege against self-incrimination." *Id*. In this case, the circuit court repeatedly cautioned Fogleman about his disregard for rules and rulings of the court—to the point of finding Fogleman in contempt—before revoking his right to self-representation. After a review of this extensive record, we find no error by the circuit court in having done so.

**Conclusion**

¶63. The lengthy record in this case, with extensive pre-trial proceedings and testimony from eight days of trial, reveals no error by the circuit court in this case. There was sufficient evidence to support a lawful pursuit and a conviction for felony evasion. There was also sufficient evidence for a jury to find that Walker suffered serious bodily injury. Fogleman's conviction for Walker's injuries was not contrary to the weight of the evidence. The jury was properly instructed on the element of serious bodily injury with respect to Walker's injuries and the seizure and admission of the methamphetamine was lawful. Finally, the circuit court did not err in revoking Fogleman's right to self-representation. Accordingly, we affirm the jury verdicts against Fogleman and the subsequent sentences by the circuit court.

¶64.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR.**